## WELCH v. SULLIVAN.

The writ of *venditioni exponas* is a simple order of the Court to sell property already levied on under execution. It confers no power to levy, and a recital in the return that the sheriff had levied and sold by virtue of the writ is an unimportant error, when it appears that the levy had been previously made under execution.

A description, in a sheriff's return, of city lots, by numbers, referring to the official city map, is sufficient.

The objection that the deeds, through which the plaintiff in ejectment deraigns title, are not properly acknowledged, cannot be maintained by one who has no privity with plaintiff's grantors.

Under the laws of the Indies, whenever a pueblo was formed by a grant to a founder, or the union of ten or more families, or the foundation of a presidio, or the secularization of a mission, each pueblo was entitled in property to certain tracts of land within the limits of the town to be set apart by them, called commons, pasture-grounds, and municipal lands, by virtue of their organization as pueblos.

The republic of Mexico, after the revolution of 1824, fully recognized the rights of the towns in their commons, pastures, and municipal lands.

Whether the Mexican government retained any power to make grants within the limits of a pueblo, or not, the right of the pueblo to have the municipal and common lands assigned, was an acknowledged equity, charged with which the United States government succeeded to the fee.

The act of Congress of 1851 operates as a grant to the pueblos of all lands within their limits, vacant and ungranted, on the seventh of July, 1846.

Such a confirmation is higher evidence of title than a patent, because it is a direct grant of the fee, by the sovereign, through the legislative department, while a patent is only a ministerial act.

The pueblos, under the laws of Spain and Mexico, had the right to dispose of certain lands within their limits, to defray municipal expenses.

The municipal law remained unchanged, after the conquest, until 1850, and grants of pueblo lands, by American alcaldes, were grants by the pueblo of its own property, which it had a right to transfer.

Whether the municipal lands of a pueblo could be sold at forced sale, or not, under Mexican law, the act of Congress of 1851 creates a new tenure, and operates a confirmation of the fee in the town or city, and by the adoption of the common law, in 1850, its lands became liable to execution-sale.

The place called Punta Yerba Buena, on which the city of San Francisco now stands, seems never to have been a pueblo separately from the presidio, which was founded in 1776.

The act of Congress of 1851, operates as a grant to the city of San Francisco of all the vacant lands within her limits, and the confirmation of the U. S. Land Commission is final as to the boundaries therein laid down, the appeal therefrom having been dismissed.

Persons who now contest a grant by competent authority within the city limits, must rely on a sufficient title, issued by competent authority, prior to July 7, 1846.

Under the laws of Mexico, and the decrees of the Departmental Assembly of California, the ayuntamiento and the alcaldes had power to grant limited portions of the municipal lands of the pueblo. The American alcaldes, appointed after the conquest, had the same authority, as the municipal law remained unchanged until 1850.

Whether under the Mexican law the municipal lands of the pueblo could be sold at forced sale or not, the act of Congress of 1851, vested the city with the fee of the land, and, by the common law, adopted 1850, it became liable to execution-sale.

A sale of the municipal land of the city in January and February, 1852, on an execution issued under a judgment against the city, rendered September 18, 1851, conveyed a legal title to the land, upon which ejectment can be maintained.

An outstanding title in a third person will defeat plaintiff's recovery in ejectment, although the defendant does not connect himself with it.

The value of improvements on land may be set-off against the rents and profits thereof.

*Per Burnett, J.*—The act of Congress of 1851, vested the title of the ungranted lands within the city limits, in the city of San Francisco, and a sheriff's sale in 1852, under

12

a judgment against the city, entered in September, 1851, passed the title of the city in the purchaser.

*Per Terry, J.*—Considerations of public policy and justice, as well as regard for individual rights acquired under the law, as announced by the highest judicial tribunal, imperatively demand a strict adherence to the doctrines of the case of Cohas *v.* Raisin.

APPEAL from the District Court of the Fourth Judicial District, County of San Francisco.

Mary Welch brought this action of ejectment to recover possession of the undivided one-half of lots one hundred and forty and one hundred and forty-one, in the city of San Francisco, and for three thousand dollars damages, alleging that she was the owner of the undivided one-half thereof in common, and not jointly. The answer of the defendants consisted of—

1. A general denial.
2. Statute of Limitations.
3. The Settlers' Act of 1856.
4. Outstanding title in Limantour.
5. Title in defendant Sullivan under the Sherreback grant.
6. Valuable improvements erected by the defendants on the premises, of the value of twenty thousand dollars.

On the trial, the plaintiff introduced in evidence the record of the judgment of the case of Peter Smith *v.* The City of San Francisco, an execution running therefrom, with the sheriff's return thereon, stating that he had levied upon, as the property of the city of San Francisco, among others, the lots in controversy, describing them by figures, and by reference to the official map of the city. The sale under this execution having been stayed by injunction, plaintiff introduced in evidence a writ of *venditioni exponas*, the return of which recited that on the fourteenth of June, 1851, the sheriff of San· Francisco sold the premises to Peter Smith, by virtue thereof; next, a deed from the sheriff to Peter Smith, and then a series of deeds connecting plaintiff with the title of Peter Smith. It further appeared from the stipulation of counsel at the trial, that there was a pueblo, and that the lands in question are within the limits of the decree of confirmation to the city, which limits embraced the pueblo, and the pueblo limits are co-extensive with the confirmation.

There was some evidence going to sustain and disprove the Limantour title. The Court, under the exception of defendants, among others, gave the jury the following instruction:

"If the jury believe, from the evidence, that the lands described in the complaint are covered by the alleged grant of Limantour, and that said grant is fraudulent and manufactured, and was not in fact made, as it purports to be, by Micheltorena, when he was actually Governor of California, then the plaintiff is entitled to recover."

The jury, under the instruction of the Court, found a verdict in the following form :

" We find for the plaintiff.

" We find the value of the whole land in question to be ten thousand dollars.

" Value of its use and occupation eighteen hundred dollars.

" Value of the improvements thereon forty-two hundred dollars."

On this verdict, judgment was rendered in favor of plaintiff for the possession of the undivided one-half of the premises, and nine hundred dollars damages. Defendants moved for a new trial, which being denied, they appealed.

*Nathaniel Bennett* for Appellant.

In ejectment, the plaintiff must recover on the strength of his own title. Every substantive fact, required by law to make out his claim, must be proved. No fact will be presumed in his favor. In the deduction of title, every *mesne* conveyance, through which he claims, must, like any other fact, be established by proof. If he claims under an execution-sale, he must not only prove the execution and judgment, but he must also establish ownership of the land in the judgment-debtor, as one of the necessary steps in the deduction of his title. These are elementary propositions.

This is an action of ejectment. The plaintiff claims under an execution-sale. The judgment-debtor is the city of San Francisco. The plaintiff can recover only what the city of San Francisco is proved to have had, and, if the city had nothing, the plaintiff can recover nothing. Again, though the city may have had an interest, yet, if it were of such a nature that it could not be taken under a forced sale—for instance, if the city were a naked trustee, holding the premises in trust for the inhabitants in general, without any beneficial interest in herself, then she had no interest which passed to the plaintiff, upon which ejectment can be maintained. From these considerations, two questions arise :

1. Did the city of San Francisco own the premises ? In other words, was the fee of the land vested in the city, or did it still remain in the government?

2. Conceding that the city of San Francisco held the fee, or had some claim, right, or title, legal or equitable, in the premises, was such a claim, right, or title, whatever it may have been, the subject of levy and sale on execution ?

I maintain the negative of both the above questions, and I assert, as propositions, which I shall endeavor to make clear :

1. The city of San Francisco was not the owner of the premises—that is to say, the fee of the land was not in the city, but still remained in the government.

2. Conceding that the city had some estate, right, or interest—it was not subject to sale on execution.

First, then, as to the vested estate in the city—I have said that the burden of proof lay on the plaintiff, to prove the interest of the city, but a very strange anomaly, in *nisi prius* trials, presents itself in the progress of this cause. The rule I have stated had been adhered to by lawyers and Judges, in this country and in England, from the earliest ages of our juridical history; and it had been supposed to be settled, that, in an action of ejectment, it lay with the plaintiff to establish by proof, that he, and those under whom he claimed, had the title, and that the burden of proof was not, in the first place, cast on the defendant to prove that the plaintiff had no title. And this rule of law was supposed to be so well founded on good sense and justice, that it had been held universally applicable, not only in actions of ejectment, but in all other actions, so that it might be said to have become an axiom in legal science, that the law would not require a party to prove a negative—that it would not call upon the defendant to disprove the alleged title of the plaintiff, until the plaintiff himself had adduced some evidence tending to establish it—that it would not deprive a person of the enjoyment of a right in possession, solely because he might not be able to disprove every unsupported claim which could be alleged against him.

This rule, however, by which justice had been administered for a thousand years, was deemed inapplicable to the condition of affairs in San Francisco, and derogatory to the advancement of legal science in the nineteenth century—while the strange doctrine was sustained by the Court, that, in an action of ejectment, where the plaintiff claimed under an execution-sale, title in the judgment-debtor would be presumed without proof, and that the burden of disproving this unsustained allegation of the plaintiff lay upon the defendant. Is this law?

I notice this here, to show how far the settled rules of evidence have been departed from, in order to help the plaintiff to recover. If the plaintiff had been held to abide by the law, and prove her case like other plaintiffs, there would have been no cause for apprehension on the part of the defendant; but as it would have been highly inconvenient for the plaintiff to be obliged to prove a fact which did not exist, the Court kindly helped her out of the difficulty by presumption.

But, notwithstanding all the aid which the plaintiff may derive from the unheard of presumption above referred to, it appears beyond doubt, from the law applicable to the case, that the city of San Francisco had no title. And I shall proceed to show that this is so:

1. By the decisions of this Court.

Welch *v.* Sullivan.

2. By the decisions of the Board of U. S. Land Commissioners for California.

3. By the decision of the Circuit Court of the U. S., for this circuit.

4. By the decision of the Supreme Court of the United States.

5. By the Spanish and Mexican law.

First, then, by the decisions of this State :

The first case in which the question was presented, was the case of Woodworth *v.* Fulton, (1 Cal. R., 295.) In that case there was no proof of ownership in the city of San Francisco, or in the town or pueblo of that name, nor was it explained whence or how any title was acquired. The Court there held, that if the city had any title, it should have been proved—that not having been proved, it could not be presumed—and that the lands lying within the corporate limits of San Francisco, which had not, previously to the conquest of the country by the American forces, been granted by the Mexican government or its officers, constituted a part of the public domain of the United States. This decision was founded upon the general doctrine, that a plaintiff in ejectment must prove title under those under whom he claims, in order to show title in himself, and that in the total defect of proof that the Mexican nation had parted with its right, the Court could not presume that state of facts ; consequently the legal presumption was, that at the time of the military occupation of California by the Americans, the title to the soil still remained in the Mexican government. In other words, all title being derived from the sovereign, no presumption could be indulged that the sovereign had parted with the title. If the fact existed, it must be proved. The Court say, page 306 : "It is claimed that San Francisco, as the lawful successor of Yerba Buena, was what is termed in Spanish law, a pueblo ; and that, being such, there was, in some undefined manner, and under some vague system of things, vested in the people of the pueblo, or in the alcalde, or justice of the peace, or ayuntamiento, as representative of the pobladores, an absolute title to a large tract of land, the limits of which have never, as yet, been ascertained farther than the city surveyor has been directed to run the lines of city lots. Whence or how that title was acquired, was not attempted to be explained on the argument; and I am not aware of any legislation, general or special, of Spain or Mexico, which vested the pueblo of Yerba Buena, or the town or city of San Francisco, with a title to a foot of land within their assumed boundaries."

The Court further say, pages 306–7 : "It does not appear that San Francisco, or Yerba Buena, was ever constituted a pueblo, or had the rights of one ; a fact which, I think, should be established by proof, and of which Courts cannot and ought not to take judicial notice; and further, even admitting that it was a

pueblo, there is still nothing in the case showing the boundaries of the pueblo, or that the lot in controversy lies within those boundaries."

Since that decision was made, the extensive and minute examinations which have been made, have proved utterly unavailing to show, either that any title was acquired by express grant from the sovereign, or that "any legislation, general or special, of Spain or Mexico, vested the pueblo of Yerba Buena, or the town or city of San Francisco, with the title to a foot of land within their assumed boundaries." On the contrary, every additional fact which has been discovered, every additional document which has been brought to light—the elaborate and learned investigations which have since been made into Spanish and Mexican law—all have tended to establish the position then taken by the Court; until at last the proof of the correctness of that position has become so accumulated and clear, as no longer to leave any room for doubt in the minds of thinking and intelligent men, who have been at the trouble to inform themselves upon the subject, and who do not deem themselves forever committed to error, because they have once happened, inadvertently perhaps, to go estray.

The decision in Woodworth v. Fulton, was made at the December Term, 1851. The doctrine of that case was re-affirmed in this Court in the subsequent cases of Reynolds v. West, 1 Cal. Rep., 322, 325; Brown v. O'Conner, id., 419, 421, and in numerous other cases not reported, both in this Court, and in the inferior Courts of the State during the years 1850, 1851, 1852 and 1853. The same view was again taken of the law in the case of Vanderslyce v. Hanks, 3 Cal. Rep., 28, 45. In this case, the defendant claimed under a grant from the pueblo of San José, which was the oldest pueblo in California, and the best known, and contained the greatest population; so that it would seem, if the extraordinary doctrine of presumption, which I am combating, could be properly applied in any case, it should have been applied to a claim arising under the pueblo of San José. But the Court say, (p. 45,) per Heydenfeldt, J., "I now come to the consideration of the defendant's title. He claims by virtue of a grant from an alcalde of San José. The regularity of this grant is assailed on various grounds, but the view I have taken renders it unnecessary to consider them. To sustain this grant, it was necessary in the first place, that the lands in dispute had been the property of the town of San José. No title was exhibited establishing this fact, and the only evidence in relation to it, was derived from reputation as to the boundaries of the town." The learned Judge then proceeds to state that, inasmuch as this evidence derived from reputation was insufficient, the alcalde's grant could not be sustained. Several points are affirmed by the Court in the case last above cited:

1. That a pueblo and town are the same thing in Mexican law—for the Court at one time designates San José as a pueblo, and at another, as a town.

2. That where a party claims title under a Mexican pueblo or town, it is necessary to show "that the lands in dispute had been the property of the town;" that is, the ownership of the town must be proved the same as the ownership of any other individual under whom a party claims title.

3. That where no proof is produced establishing ownership in the town or pueblo, the Court cannot presume and decide, as matter of law, that the pueblo or town was the owner of the lands.

4. In this case, there is no presumption indulged, independent of proof, as to the limits of the town or pueblo, nor do we find the still more astounding doctrine, that whatever lands a local officer might see fit to give away to any person, were to be presumed, in law, to be included within the limits of the pueblo or town.

5. We hear nothing of the doctrine that the grant of a lot in a pueblo, made by an alcalde, raises the presumption that the alcalde had authority to make the grant. The novel doctrine of presumption afterwards advanced, does not seem at this time to have occurred to the minds of the Court, and, therefore, the positions taken are in accordance with law.

But, again, in the case of Leese & Vallejo *v.* Clark, (3 Cal., 17,) the Court holds a doctrine equally strict. In that case, the plaintiff claimed under a grant made by the Governor, of a water-lot at the embarcadero of Yerba Buena, (being near the very centre of San Francisco.) On the trial of the cause below, the plaintiff offered the original petition and grant, executed in proper form, in evidence, but the Court rejected the offer, whereupon a verdict and judgment were rendered in favor of the defendant. This Court, on appeal, affirmed the judgment. Mr. Chief Justice Murray delivering the opinion of the Court, says, after citing certain Mexican laws and regulations concerning the granting of lands, "I have cited these regulations to show that the alienation of the public domain of Mexico was a subject of careful consideration with that government, hedged around with an infinity of restrictions for the protection of the sovereignty, and that the loose and careless conduct of her governors, in executing this trust, was not approved by the supreme government, although removal from the scene, and the insignificant value of the lands at that time, seemed to direct public attention from these abuses.

"To these regulations this Court can alone look, and by them every grant must be determined. Had we the power to discriminate, its exercise would be more dangerous, and productive of more injustice, than the total inability to go beyond them.

"If the officers of the Mexican government, to whom was con-

fided this trust, exceeded their authority, or neglected the solemnities and formalities of the law, this Court is bound to take notice of it, and cannot shield those claiming under such titles from the necessary consequences of ignorance, carelessness, or arbitrary assumptions of power.

" The grant from Alvarado to Leese and Vallejo contains nothing but a petition and grant of the Governor. There is no map attached, no survey, record, or evidence, that the plaintiffs have ever been put in judicial possession, no act of the Territorial Deputation confirming the act of the Governor, or evidence that the grant, together with a map, were recorded in a book kept by law as a record of said grants, as provided in section ninth of the act of 1828. But that these requisitions must be fully complied with, this Court has no doubt, without which severance of the land from the public domain, and a rigid adherence in all other respects, the title did not pass to the grantees, but remained in the government of Mexico.

" The title at best can only be considered as inchoate. It passed with the map of the property of Mexico to the United States, who now hold it, subject to the trust imposed by the treaty of cession and the equities of the grantees."

And again, in the same case, the Court uses the following language:

" Holding, as we do, that the law of 1824, and the regulations of 1828, must be strictly complied with, that the title of the plaintiffs at best is inchoate and incomplete, and therefore insufficent to maintain ejectment, we are of opinion the Court below properly excluded it as testimony."

There are several things worthy of note in this case:

1. That, in granting lands in the city of San Francisco, the officer making the grant was obliged to follow strictly the laws and regulations which had been prescribed for that purpose by the Mexican government, and that any grant of a city lot, not made in strict conformity with the laws and regulations, would be held invalid.

2. That a party could not recover a lot in the city of San Francisco merely upon the strength of his petition and a Mexican grant, made in due form, in pursuance thereof.

3. That the land in controversy, although clearly situated within the limits of the then city of San Francisco, and what the Court has since recognized as the former pueblo or town of San Francisco, constituted a part of the "public domain" of Mexico, and that without a rigid adherence to the Mexican laws and regulations, the title did not pass to the grantee, but "remained in the government of Mexico," and had afterwards "passed with the map of the property of Mexico to the United States, who now hold it, subject to the trust imposed by the treaty of cession and the equities of the grantees."

4. In this case, as in Vanderslyce v. Hanks, we hear nothing of the subsequent doctrine of the Court that they would presume, as matters of law, that there was a town; that any land granted was within the town; and that the officer had authority to grant; and that a simple grant, without any other evidence whatever, was sufficient to enable a party to recover in ejectment.

Thus, we see that the principle of the case of Woodworth v. Fulton, was sustained in this Court, and in all the inferior Courts, during the years 1850, '51, '52 and '53, and was supposed to be the established doctrine of this Court.

Against these decisions, stands the case of Cohas v. Raisin. In this case, the defendants had obtained possession of the lot from and under the plaintiff, and then neglected to perform their part of the very contract under which they had entered into possession. Whether the plaintiff had title or not, was immaterial, for the defendants had obtained possession from him, and still held possession under him, and, therefore, they could not dispute or question his title; and, besides, the plaintiff had only covenanted that he would execute a good warranty-deed, and, whether he had title or not, he could, unquestionably, execute a good warranty-deed, upon the covenant of warranty, in which the defendants, if ever evicted, could have maintained their action. For, that there is no breach of warranty until there is an actual eviction, and that the covenant that the plaintiff will execute a good warranty title refers to the deed itself, and not to the title to the property, are rudiments in law. See 4 Kent's Com., 471, and 20 Johns., 129.

The case, then, was simply this: the defendants having procured possession from the plaintiff, they were estopped, so long as they retained such possession, from questioning the title of the plaintiff.

The facts of the case bring it within that class of cases, of which Hoen v. Simmons, 1 Cal. Rep., 119; Tartar v. Hall, 3 ib., 263; Redman v. Bellamy, 4 ib., 247; are examples.

In Hoen v. Simmons, the defendants claimed that the plaintiff had sold them the premises in question, and that they had taken possession on the faith of such contract; but that they had neither fulfilled nor offered to fulfill the terms of the contract which they set up. In a suit brought by the plaintiff to recover the premises, the defendants relied, in bar of a recovery, on want of title in the plaintiff. But the Court say: "The defendants having entered into possession, claiming under the plaintiff, and in subordination to his title, are estopped from questioning it."

In Tartar v. Hall, the plaintiff executed and delivered a conveyance to the defendant, of one hundred and sixty acres of land belonging to the United States, and delivered possession thereof to the defendant, and the latter gave his note, and exe-

cuted to the plaintiff a mortgage upon the same land. In a suit brought by the vendor and mortgagee, to enforce payment of the note and mortgage, the defendant set up that the plaintiff had no right, title, estate, or interest in the premises, and had no power or authority to convey the same.

But the Court, per Heydenfeldt, J., say: "The mortgage executed by the defendant operates an estoppel to the defence he has set up, according to well established principles of public policy, for the security of good faith and fair dealing, a party is not allowed to controvert the declarations which he has made by deed, or to deny the enforcement of rights which he has thus attempted to confer.

In Redman v. Bellamy, the defendant had executed a mortgage upon premises of which he claimed to be the owner. Having availed himself of the consideration for which he executed the mortgage, he set up, as a defence to an action of ejectment, brought by the purchaser, under a judgment in a suit of foreclosure, that he was not the owner, but that the title was in another person. But the Court, per Heydenfeldt, J., say: "The plaintiff claims under a sheriff's sale. The execution was upon a decree of foreclosure of mortgage executed and given by the defendant. He is, therefore, estopped from setting up the defences attempted in this case." And the Court cite the above case of Tartar v. Hall, as an authority in point.

These cases proceed upon the principle, that a person shall not be permitted to enjoy a right, and at the same time controvert or deny the validity of the title under which that right is enjoyed, and thus avoid the obligation which he has incurred. And the same principle is applied to the case of Cohas v. Raisin, and it is the only principle, either of law or of ethics, which is applicable to the facts upon which the Court was called upon to pass judgment.

But the facts of the case did not involve the consideration of any, or either, of the matters thus stated to be involved. And this admission of the parties, that the plaintiff claimed under an American alcalde, upon which this statement in the opinion proceeds, has been shown to be wholly immaterial.

" The laws of Spain fully recognize the right of cities, towns, and villages, to acquire and dispose of real estate, subject to the royal regulations, which were made from time to time for their government."

Undoubtedly, the laws of Spain, like the laws of all civilized communities, recognized the right of cities, towns, and villages, as well as of individuals, to acquire and dispose of real estate, subject to the royal regulations, or, which is the same thing, subject to the laws. But what has this to do with the matter in hand ? even conceding that matter to be the immaterial proposition which the opinion has just above announced as being in-

volved in the case. Because cities, towns, and villages, had the right to acquire, does that prove that they did acquire in all cases? Does that prove that the town of San Francisco had acquired? And because they could "dispose of," according to law, does that prove that they could "dispose of," without law, or contrary to law?

I would, in all seriousness, ask what support for the doctrine sought to be sustained, can be derived from this law? In order to be of any avail to the opinion, the reasoning must be this: It is the will and pleasure of the King, that cities, towns, and villages shall retain their rights, revenues, and municipal lands, therefore they have a right to part with them; but, says the King, it is our further will and pleasure, that no grants be made of such lands—therefore, a grant of such lands by an American alcalde is good. Again, says the King, we command that all grants of the same, or any part thereof, which we may make to any person, be of no value whatever—consequently, says the opinion, because grants by the King are void, grants by an American alcalde are valid.

The law cited in the last quotation of the opinion, as Law 1, tit. 16, lib. 7, of Nov. Rec., which is the same as Law 2, tit. 5, lib. 7, R., has been as often misunderstood and perverted as it has been cited in our Courts. The law, when correctly translated, is as follows:

"Our will and pleasure is to preserve to our cities, *villas*, and *lugares*, their rights, revenues, and *propios*, and not to make any grant of anything thereof: Wherefore, we command that the grant, or grants, of them, or any part thereof, which we may make to any person whatever, be not valid."

This law speaks of such things only as have been already acquired by cities, *villas*, and *lugares*, but it confers no new property or rights upon the places spoken of. So, also, when the law guaranties to the towns their privileges, offices, uses, customs, and franchises, (as in Laws 1, 2, 3, 4, and 5, tit. 2, lib. 7, Rec.; and Law 3, tit. 5, lib. 3, Rec.,) or rights, revenues, and *propios*, as in Laws 1 and 2, tit. 5, lib. 7, Rec., (the first being the law quoted in the opinion,) or *aldeas*, fortresses, etc., (as in Law 6, tit. 5, lib. 7, Rec.,) it speaks of those things which have been expressly granted to them, or acquired by some legitimate title, and is only in affirmance of the principles of natural justice equally applicable to the rights of individuals and of corporations; and when it gives a solemn pledge to preserve to the towns and cities in Spain, their *terminos comunes* or *valdios*, *ejidos*, *montes*, and *pastos* (as in Laws 1 and 2, tit. 7, lib. 7, Rec.,) and that the sovereign will not sell any part of the *terminos publicos*, or *valdios*, (as in Laws 8 and 10, tit. 5, lib. 7; and in Law 11 of same title, which refers to the solemn contract between the King and the people, known as the "*Condicion de Millones;*") it has exclusive reference to vacant

lands in Spain, of which the citizens of the towns had enjoyed the use in common for many centuries, and proposes the perpetuation of a system of policy, in reference to the public lands, which was completely abandoned in 1813.

These laws, with others of a like nature, so frequently cited in our Courts, recognizing certain rights, privileges, exemptions, and property, in towns, refer to such rights, etc., as had been conferred by special and formal acts of the legislative power, and prove this, and this only,—that the sacred right of property, founded in the law of nature itself, was respected by the sovereign, whether vested in individuals or corporations.

For all the rights or property which individuals, towns, or corporations, had acquired, must appear in the documents by which they were acquired, or in the general guaranties of the common laws of Spain, extending alike to individuals, towns, villas, cities, and corporations.

But again : " The manner of granting municipal lands to towns, and the manner in which they were allowed to rent or dispose of them, depended upon royal regulations, which were changed from time to time. At one period they could grant or sell them, and at another, they could only lease them, either for a term of years, or forever, the rents forming a fund for municipal expenses. But these grants, sales, and leases, were always made by the municipal authorities, with the permission of the crown; but neither the King nor the crown-officers could themselves dispose of the lands once granted or acquired by the towns." Now, if this statement has any applicability at all, it tends to overthrow the very doctrine in support of which it is cited. There is no doubt but the manner of granting lands to towns, and the manner in which they were allowed to rent or dispose of them, depended on regulations of the King, or of the legislative power. But such a doctrine cannot be cited for the purpose of establishing the fact that a grant of lands had been actually made to San Francisco; or, if such grant had been made, that an alcalde had the power to dispose of lands thus granted, in violation of regulations of the King, or legislative power.

To proceed, " In forming new towns, the Viceroys were directed, not only to mark out to them common lands, but also to give municipal lands (*propios*) to those who had none, the proceeds of which will serve to pay the corregidors." But, is it to be inferred, because Viceroys were directed to give municipal lands to new towns, that, therefore, a Viceroy, or anybody else, had given municipal lands to San Francisco ?

There is, however, another difficulty which occurs before any such inference can be deduced from the authority cited—and that is, the Spanish word *propios* happens to be incorrectly translated " municipal lands." The term has a much broader signification.

"In some of these orders and decrees, the municipal authorities were allowed to alienate the municipal domains only in case such measures were necessary for the good of the towns." In what orders or decrees? Must we infer, because the municipal authorities of some towns were, by express order or decree, authorized to alienate municipal lands, in case such alienation was for the good of the town, that, therefore, the municpal authorities of San Francisco might, without any order or decree, alienate the lands of San Francisco, not only where it was not necessary for the good of the town, but where it was highly prejudicial to its interests?

"On the sixth of August, 1834, the Territorial Deputation of California authorized ayuntamientos of towns to apply for (egidos) common lands, and (propios) municipal lands, to be assigned to each pueblo."

"Authorized ayuntamientos to apply for," etc. But how does that help the argument? Does it necessarily follow, because ayuntamientos had the authority to apply, that they did apply? And further, that their application was granted, and was followed up by an actual assignment of the lands, by actually marking them out, and specifically dedicating them for each particular purpose—some for propios, others for egidos, others for dehesas, etc., in the manner in which the law required these things to be done? Every individual was authorized to apply for a grant of lands to the Government; but every person did not apply, and not every person who did apply, was successful in his application.

"By the law of August 9, 1834, article fifth, municipal lands were to be granted to the new pueblos formed out of the secularized mission."

"Were to be granted," etc. But were they granted? The question is not so much what might be, as what was.

"On the third of November, 1834, the Territorial Deputation of California decreed that the Governor should direct the election of an ayuntamiento in the partido of San Francisco, to be composed of one alcalde, two regidors, and one sindico. This ayuntamiento was directed to mark out, in the shortest time, the boundaries or limits of its municipality.

If an alcalde's grant be good, of a lot of land within the present limits of the city of San Francisco, upon the ground of the existence of an ayuntamiento for the partido of San Francisco, it must be equally good of a lot in any other portion of the territory within the jurisdiction of the ayuntamiento. But what would be said of a grant by an alcalde of San Francisco, of a lot of land in Sonoma or Marin counties? Yet the validity of such a grant is a necessary deduction from the doctrine of this opinion in Cohas v. Raisin.

The truth of the matter, however, is, that this action of the

Territorial Deputation, the election of the ayuntamiento, and all the subsequent actions of that body, had nothing to do with the municipal organization of any town, but was a temporary organization for the entire northern portion of the territory.

Further, at the date of this proceeding of the Territorial Deputation, the power of establishing pueblos, or towns, did not rest with the deputation ; it could only be exercised by the supreme government. The deputation could merely take the initiative, and their recommendation was to be transmitted through the proper authorities to the supreme government, for its final action.

But further, the proceedings of the Territorial Deputation do not purport to direct the establishment or organization of a pueblo, or town, or villa, or city, or any other municipal body—it simply directs that the *partido*, or district of San Francisco—thus speaking of something already existing—proceed to the election of a constitutional ayuntamiento, to be established in the presidio of that name.

Above all, the proceedings of the Territorial Deputation, and the action had in pursuance thereof, were, at the utmost, but the organization of a political body, charged with the government of a limited district of country, and were in no wise connected with, or followed by, a change in the property to a single foot of land.

The original decree, and the whole thereof, is as follows :

" 1. That the political chief direct the district (*partido*) of San Francisco to proceed to the election of a constitutional ayuntamiento, to be established in the presidio of that name, to be composed of one alcalde, two aldermen, (*regidores*,) and one town-attorney, (*sindico procurador*,) conforming, for that purpose, in all respects, to the Constitution, and the laws of the eighteenth (twelfth) of July, 1830. 2. That report be made through the proper channel to the supreme government, for an approval."

And the original order of Figueroa is as follows :

" SEAL OF THE POLITICAL GOVERNMENT }
OF UPPER CALIFORNIA. }

" The most excellent Territorial Department, using the powers conferred on it by the law of the twenty-third June, 1813, on yesterday passed the following instruction :

[Here follow the resolutions of the department, as copied above.]

" And I transcribe it to you for your information and compliance, recommending that the election be carried into effect on the day appointed by said law of the twelfth of June. I also notify you that the ayuntamiento, when installed, will exercise

Welch *v.* Sullivan.

the political functions with which you have been charged, and the alcalde the judicial functions which the laws, for a want of a Judge of letters, confer upon him, you remaining restricted to the military command alone, and receiving, in anticipation, the thanks due for the prudence and exactness with which you have carried on the political government of that demarkation.  God and Liberty.

"November 4th, 1834.

"Jose Figueroa.

"To the Military Commandant of San Francisco."

In what manner this direction, concerning the demarkation of boundaries of a municipality, .came to be inserted in Wheeler's Land Titles, I am at a loss to conceive.  It is certain this clause is not contained in the original, either of the decree, or of the order.

But, suppose such direction was contained in the decree, or order, or both of them, and, moreover, suppose the ayuntamiento did mark out the boundaries, what then?   Does it result from that, that the *partido*, pueblo, district, or town, became the owner of any of the land within, or without, the boundaries thus designated?   No law has ever been produced sanctioning such a supposition; no authority has been cited, nor can be—none such exists.

"And it must be presumed," continues the opinion, (in Cohas *v.* Raisin,) " that the ayuntamiento did its duty in marking out boundaries as directed, especially as they immediately commenced making grants of the lands."   5 Cranch, 242 ; 3 Wheat., 594 ; 3 Peters, 320.

The foundation of this superstructure, raised by presumption, is overthrown by the consideration, that no direction was given to mark out boundaries, as the opinion erroneously supposes. This has already been shown.  But if it were otherwise, this doctrine of presumption does not apply, and the authorities cited do not sustain it.   The first case cited in the opinion, is Taylor *v.* Brown, 5 Cranch, 234, 242.

The next case cited in support of this doctrine of presumption is Craig *v.* Radford, 3 Wheat, 5, 94.   The presumption in this case, as in Taylor *v.* Brown, was of the warrant being in the hands of the surveyor, from the fact of the survey—the facts being the same as in Taylor *v.* Brown, and arising under the same law, and the decision of the Court being based upon that case.

The next and last case cited is that of Stringer *v.* Lessee of Young, 3 Pet., 320.   This case neither decides nor treats of the doctrine of presumption, in any respect; and is no authority, either way, upon the point under discussion, unless a bare reference, in the decision of the Court, to the case of Taylor *v.* Brown,

in support of another point, be deemed authority in support of this doctrine of presumption.

How much more in accordance with law are the remarks of the Chief Justice in Leese and Vallejo v. Clark, 3 Cal. 25, 26, speaking of the regulations of the supreme government, of November 21, 1828.

But, upon principle, who ever heard of a party being presumed to have done an act barely because he was required or directed to do it? A party is required to prove that he has done the act which the law, or his superior authority, has directed him to do, when the doing of that act is necessary to sustain some right which is claimed. The law would hardly be guilty of doing so foolish a thing, as to direct an act to be done, and then presume that it had been done, from the fact of its having directed it.

But, as another reason against this presumption that the ayuntamiento marked out the boundaries is, that as late as May 1st, 1844, there were no fixed and determined limits, for, in a grant made on that day by Governor Micheltorena to Francisco and Ramon Haro, of the potrero of San Francisco, the following language is used : "I have resolved to permit them to occupy the potrero mentioned, subjecting themselves to the measurement which shall be made of the *egidos* of the establishment of San Francisco." Wheeler's Land Titles, p. 12. The author cited very justly remarks, (id. p.,) "By this, it appears the lands of the town had not been marked out."

"In 1839, it was thought by the Governor, that the number of the population in San Francisco, being greatly reduced by the secularization and partial ruin of the Mission, was not sufficient to authorize the maintenance of an ayuntamiento, and *juezes de paz* were elected in place of that body, as directed in the law of March 17th, 1837."

"These *juezes de paz* commenced making grants of one-hundred-vara lots, in the same manner as had been done by the alcalde. But a question now arose, whether the justice could, under the law of 1837, (vide acts, 180, 186,) exercise that power in place of the alcalde, without a special ordinance of the departmental junta. To remove this doubt, a special ordinance was passed, and communicated by the governor through the prefect, but limiting the grants by a justice, to fifty varas square."

These justices of the peace had the same authority *per se,* which the ayuntamiento had, to grant lots, that is, none at all.

As suggested above, these lands had been the lands of the town, or other than part of the national domain, the justices of the peace should, and would have made their grants by virtue of some other authority than that of the departmental government—that is, they would have obtained their authority, and so expressed it, from the town, the owner of the lands.

We now come to a new era. On the seventh of July, 1846,

possession was taken of Monterey, and subsequently, of the rest of the territory. The President of the United States, as commander-in-chief of the army, directed his subordinate military officers to organize a civil government, for the purpose of preserving the domestic peace and quiet of the country, and preventing a state of anarchy. This was no more than is done in all cases of an armed occupation of a country, in the condition in which California then was; for the old government being broken up, a new one was absolutely necessary to subserve the purposes of police, and prevent or punish the commission of crime. The office of alcalde of San Francisco was filled by an American citizen, and continued thereafter to be filled by an American, until the office was finally abolished in 1850. These officers, as well as all others, except such as were appointed by the American military governor, or by the President of the United States, were elected by American citizens, settled or stopping, either as soldiers or otherwise, at the place called Yerba Buena.

The decision in Cohas v. Raisin assumes:

1. That there was an organized town or municipal government, extending over, and confined to, the particular locality now known as the city of San Francisco.

2. That a grant, or that grants of definite parcels of land, had been made by the Mexican government to such town.

3. That such grant or grants were of lands situate within the present limits of the city of San Francisco.

4. That such grant or grants embraced all the lands within the limits of the present city.

5. That any grant made by an alcalde was within the boundaries of the assumed Mexican town or pueblo.

The same question has been passed upon by the Circuit Court of the United States, for this circuit. In the case of Field v. Seabury et al., tried before the Circuit Court in 1856, the parties claimed under American alcalde's grants. The Court, Judge McAllister presiding, charged the jury that the grants were absolutely void—that the alcalde had no power or authority to grant the land, which land constituted a part of the public domain of Mexico before the war, and had passed with the conquest to the United States—that the parties were chargeable with notice of such want of power and authority in the alcalde, and, therefore, that the possession was not even colorable. And, on error to the Supreme Court of the United States, although the judgment of the Circuit Court was reversed on another ground, the Court approved that portion of the charge of the Circuit Court, which related to the point now in issue, and declared that, " in this the Court was correct."

" The Spanish word *pueblo* means, in its original signification, the people or population generally; it also means the inhabit-

· 13

ants of a particular place, but in its more restricted signification, it means a *town* or village, or any collection of persons residing in the same place, and corresponds to our general term town, as applied to similar collections of houses and people, whether of greater or less extent.    This last is the sense in which the word is used in the various laws and official documents to which reference will be made in the course of this examination."

A brief historical notice will, not inappropriately, commence this portion of my argument.    Leyes Fundamentales de la Mornarquia Española, by R. P. Fr. Maguin Ferrer, pages 146, 147, vol. 1, and note 2 to title 8, lib. 1, Fuero Viejo de Castilla, by Asso y Manuel, and the "addiciones" to the preliminary discourse to this code by Pedro Jose Pidal.

It is a necessary deduction from the foregoing brief sketch, that pueblos or settlements, at their origin and for some centuries after, had no rights, political, judicial, or of property, greater than the mass of their fellow-citizens—and that they commenced acquiring additional privileges by receiving from the sovereign *fueros* or franchises—and that whatever property they acquired, must have been acquired by them from the former owner, the same as by any natural person.    If the pueblo had grown up on the land still retained *by the sovereign*, he might, at the same time he granted a *fuero*, transfer to the pueblo such portions of land as he deemed proper, or none at all.    But if the pueblo had sprung up on the land which had been allotted to one of the lords, the sovereign could not, when he granted the *fuero*, convey any right whatever to any lands—but then, it was necessary to procure it by grant from the lord, the owner thereof.    On the other hand, though the lord might bestow upon a settlement or pueblo on his lands, the title to a portion of the soil, it was beyond his power, as has been stated, to give to the settlement a corporate existence; for, it was a well settled principle of law, that no corporation, of any class, municipal or otherwise, could be formed, without express royal license and authority.    See Instituciones del Derecho Publico General de España, vol. 1, page 273 ; L. 1, tit. 15, lib. 2, R. ; L. 4 and 7, tit. 4, lib. 2, R. I.; L. 2, tit. 5, lib. 3, N. R.

To the same effect is Gregorio Lopez on L. 9, tit. 28, p. 3. " The privileges of incorporation," (says Perez, Compendio del Derecho Publico y Comun de España, vol. 1, p. 332,) " or town, are, firstly, to have defined *terminos*, the designation whereof is, in Spain, the exclusive property of the sovereign ;" and again (p. 331,) " the distribution of the land is made by authority of the King.    They never pertained by right to those who occupy them, until the King has granted them," etc.

Before proceeding further, let us ascertain what is meant by the *propios, rentas, arbitrios, solares, valdios*, etc., of towns.    The *solares* in newly founded towns in Spain, as well as in the New

World, were small lots or parcels of land within the *terminos* of the town, intended for *repartimiento* or distribution among actual settlers, and specially assigned and set apart for that purpose. " Let the *solares* be distributed by lot to the *pobladores* or settlers, continuing from those which correspond to the *plaza mayor*, and let the rest remain for us to make grant thereof to those who shall afterwards come to settle, or whatever our pleasure may be." L. 11, tit. 7, lib. 4, R. I.; see also tit. 17, lib. 7, N. R.; Elizondo Practica Forense Universal, v. 5, p. 233; 1 Feb. Mej., 305; Law of March 20, 1837, art. 9; Biblioteca de Legislacion Ultramarina, v. 5, p. 215.

We have already seen that, by the laws of Spain, not only is it the exclusive prerogative of the King (or, since 1812, of the Cortes), to grant the title of *villa* to any place, and to designate the *termino* or demarkation of its jurisdiction, but that all the rights, privileges, property, and exemptions which it can claim, must be derived from the same source. The same principle is declared in the law of 1627, which is L. 6, tit. 8, lib. 4, R. I.

The law is sixty-four years later in date than L. 2, tit. 7, lib. 4, R. I., and must be considered as modifying it, if any real conflict exists between them.

We accordingly find that when it was proposed by the inhabitants of the pueblo of Manzanillo in Cuba to establish local authorities at that place, erecting themselves into a separate municipality, the *expediente* formed for that purpose had to be passed to the Council of the Indies in order to obtain the royal sanction.

From this document several important conclusions are deducible in harmony with the laws and authorities before cited.

1. That no power short of the sovereign could erect a municipal corporation at Port Royal, give to the inhabitants a separate jurisdiction and local government, and segregate them from that of Bayamo, in whose *termino* they had been comprehended, though fourteen leagues (nearly forty miles) distant from it. The Captain-General of Cuba, though possessed of the *omnimodas facultades*, the plenary powers of the Viceroys, could not even take the initiatory steps, so as to create an inceptive right, but forwarded the *expediente* directly to the king, by whom the initiatory orders were given. This is a practical exposition of L. 6, tit. 8, lib. 4, R. I., as late as 1830–3.

2. That a municipal corporation may be fully established with its *termino*, or jurisdictional limits marked out and defined, and its ayuntamiento and other authorities fully installed, without giving that corporation any shadow of right to lands within its limits, or to any other property whatsoever.

The right of common, that is, the common use and enjoyment, which the *vecinos* have in the *terminos publicos* and *consejiles* of the cities, *villas*, and *lugares*, was only a precarious servitude exist-

ing by sufferance in the royal lands remaining undisposed of, which did not impair the sovereign's full and absolute property in the lands, nor prevent the free disposition thereof by him—a right which was fully exercised by the Cortes of January 4th, 1813. The _terminos_ or _consejiles_, or the commons of towns, embraced all the public and vacant lands in Spain..

The uniform policy was opposed to their alienation by the crown, to whom the property therein pertained. L. 8, 9, 10, tit. 21; L. 1, 2, 3, tit. 23; and tit. 24–5, lib. 7, N. R.

In America, shortly after its discovery and first settlement, the use and enjoyment of all the vacant public lands were declared to belong to the citizens in common (L. 5, 6, 7, 8, and 9, tit. 17, lib. 4, R. I.), which are understood to be restricted in the same manner as in Spain to the citizens of the respective towns, within whose _termino_ or demarkation the said public and vacant lands may exist, unless some special provisions have been made to the contrary as in L. 3, tit. 8, lib. 4, R. I.

Although the laws contained in titles 21, 22, 23, 24 and 25, lib. 7, R., show that the general policy of the Spanish government was opposed to the alienation of the public lands, or their conversion to any other use than that of common of pasturage, they do not show nor contain any evidence whatever, that the towns or citizens thereof, individually or in common, owned anything, much less any lands, except such as had been conveyed to them by the sovereign or other proprietor.

Is the question asked, have towns, then, no property by virtue of their establishment, in Mexico and other Spanish countries—none but such as they acquire in the same mode as natural persons? I answer, none whatever. It was, no doubt, contemplated by the colonization laws of Spain and Mexico, that lands, for certain purposes, should be assigned to towns, and it is clearly contemplated by the same laws, that lands should be given to individuals. But in many, perhaps the majority of cases, both the one and the other are found destitute, because they did not get any grant from government, or because they had not the means to buy them, or, because they did not want them.

The royal regulation of October 24, 1781, made especially for California, provides (art. 4) that "the _solares_, which may be granted to new _pobladores_, must be assigned by the government in the sites and with the extension corresponding to the situation of the land where the new pueblos may be established," etc.; (art. 5) that "the distribution which shall be made of the said _suertes_, as well as of the _solares_, must be made in the name of the King, our lord, and shall be executed by the government with equality and in proportion," etc.

There is another commentary, of somewhat modern date, on the laws of Spain and the Indies, which I have cited, to show that the landed property of the sovereign is not changed, or in

any manner qualified or restricted, by any territorial demarkations whatever. The city of Havana, in the Island of Cuba, was founded in the year 1515. In its municipal ordinances, formed by the King's command, and approved May 27, 1640, authority was given to the ayuntamiento (see articles 63 to 72) to grant building-lots, as well as lands outside of the pueblo for keeping cattle, etc. Legislacion Ultramarina, vol. 3, p. 410.

By a royal *cedula* of November 23, 1729, they were prohibited from exercising this authority any longer. Biblioteca de Legislacion Ultramarina, v. 6, p. 43.

The regulation of November 21, 1828, contains the authority for the distribution of lands, in towns as well as elsewhere, in the territories of the Mexican republic. It is delegated by the supreme government to the *gefes politicos,* and Territorial Deputations, and these have, in their turn, delegated the power, with such restrictions as they have thought proper to impose, to other inferior authorities.

Subsequent to the regulation of 1828, and after the establishment of the Constitution of 1836, the power to regulate the distribution of lands in towns, was conferred upon the prefects, (law of March 20, 1837, article 77,) a provision which was adopted by Congress from the Constitution of the State of Mexico, (article 155.) The sixteenth section of the general Colonization Act of the Mexican Congress, of August 18th, above referred to, provides that " the government, in conformity with the principles established in this law, shall proceed to colonize the territories of the republic." The President, by the regulation of November 21, 1828, committed to the Governors and Territorial Deputations a portion of the authority which the law confers on the government alone."

It is true that poblaciones (towns) are not permitted to be founded without license from the supreme power of the State, (*Compendio del Derecho Publico y Comun de España,* vol. 1, p. 330. *Ordenanzas de Tierras y aguas,* p. 80.) But the prohibition or the license to form poblaciones has nothing to to with the property in the land which may be occupied for that purpose. That must be acquired from the lawful owner. A simple reference to the archives of the Departmental government, and to the records of grants made prior to the American conquest in the place called Yerba Buena, and in the secularized mission of San Francisco, would set us right on this point. The local authorities, or municipal, of the mission, and so-called pueblo of San Francisco, by whom these grants were made in the two places referred to, never pretended to have any inherent power or authority, *ex officio,* to make them, much less did they claim for the town any property in the lands granted, but acknowledged that the authority was derived from the Departmental govern-

ment, taking especial care to have this appear on record in the book of protocols, for the security of the respective grantees.

As a conclusion from the above propositions, we claim, that, after the limits of towns have been legally established, which can only be done by supreme authority, the sovereign remains the absolute owner of all the lands within those limits, to which a legitimate title cannot be shown by individuals or corporations; that, as such, he may freely donate, or distribute them; that he may alter, restrict, or enlarge the limits, once assigned to any town, or revoke them, at pleasure; and, that no town can acquire any right, even to the use of the lands embraced in them, as against the sovereign, unless by special grant, or immemorial prescription, that is, in the same manner as any individual, or other corporation; and that the right of common, which the citizens enjoy, though exclusive of those of other towns, is not in exclusion of the sovereign's right of property and possession, and, consequently, the only acts which the municipal authorities can do, affecting these lands, are such as are purely administrative, and belong to the local jurisdiction conferred by the charters.

*Saunders & Hepburn* for Respondents.
No brief on file.

MURRAY, C. J., delivered the opinion of the Court.

This was an action of ejectment, brought to recover the undivided half of two town lots in San Francisco.

The first error assigned is, that the Court admitted in evidence the writ *venditioni exponas.* The error is said to arise from the fact that the return of the sheriff upon the writ showed that he had levied upon and sold the property, by virtue of the writ, when it had already been levied upon by an execution which had expired. The writ of *venditioni exponas* is a simple order of Court, directed to the officer, commanding him to sell the property already levied on. It is no authority to levy, and the recital in the return that he had levied and sold by virtue of the writ, would be unimportant, when it appeared that the property had been previously levied upon, and that the writ only directed the sale thereof. Admitting that the officer, through mistake of the nature of the writ, had thought proper to levy upon the property, this unnecessary act on his part would not vitiate the sale, which would have been perfectly regular without it. Smith v. Morse, 2 Cal. In addition to this, the irregularity of the sheriff's proceedings would not defeat the sale. Smith v. Randall, Jan. T., 1857.

The next error alleged is, that the description of the lots in the sheriff's return is insufficient. They are described by reference to the official map of the city, as lots one hundred and forty

and one hundred and forty-one, which we suppose is sufficiently certain, for all practical purposes. Again, it is contended that the plaintiff cannot maintain an action of ejectment, as tenant-in-common, for an undivided half interest. It is said that tenants-in-common should sue for partition, or unite in a conveyance to one party, for the purpose of bringing suit.

We have repeatedly held, that tenants-in-common must sue separately, for the recovery of real estate, and we know of no rule which would compel a party to divest himself of, or alter his estate, for the purpose of asserting his title thereto. Again: it is said that the jury found a special verdict, showing the value of the permanent improvements, which should have been set-off against the damages, under the two hundred and fifty-seventh section of the Practice Act. There was no application for any such relief, the defendant claiming under the act of 1856, for the relief of settlers, which has already been held unconstitutional by this Court; besides which, the improvements were made after the commencement of the suit.

The next error assigned is, that the Court charged the jury, that if they found the Limantour claim fraudulent, they should find for the plaintiff. This instruction was not erroneous, under the particular circumstances. The defendant did not attempt to connect himself with the Limantour claim, in any way, and the question, whether that grant was fraudulent or not, had been distinctly made before the jury.

The objection that the conveyances through which the plaintiff deraigned title, were not properly acknowledged, is untenable, as the defendant does not claim as a subsequent purchaser, and there is no privity between his pretended title and that of the plaintiff.

The argument of the appellant assumes, first, that the city of San Francisco was not the owner of the premises in controversy at the date of the sale thereof to the plaintiff, *i. e.,* that the fee of the land was not in the city, but remained in the government; and, second, conceding that the city had some estate, right, or interest in the land, it was not subject to sale on execution.

The argument consists mainly in reference to the case of Woodworth *v.* Fulton, and in a review of the case of Cohas *v.* Raisin, in which the decision of the former case was overruled. In reference to the latter case, it is due to myself to say, that I was absent at the time it was argued, but learning on my return that it had been submitted on the questions upon which it was afterwards decided, I wrote a special concurrence. That concurrence proceeded on the ground that San Francisco, at the date of the grant in question, was a pueblo, and by the laws of Spain and Mexico was the owner of municipal lands, which might be disposed of by her alcaldes or other municipal officers; and, second, that the act of congress of 1851, "to settle private

land claims in California," operated a grant to the city of San Francisco of all the lands within her boundaries in 1846. So that whatever the title of the United States might have been at the time of the treaty, the city of San Francisco, if she had any municipal lands, although the title before that time was inchoate, became the absolute owner thereof in fee.

I shall endeavor to maintain these two propositions in this opinion, and to establish at the same time, (conceding that the opinion of Cohas *v.* Raisin is not law,) that this Court is bound by that opinion on the principle of *stare decisis*, and that it would be a violation of every principle of morality and justice to disturb it at this late day.

In such cases, Courts are permitted to exercise a wide discretion, and judges are not expected or required to overturn principles which have been considered and acted upon as correct, thereby disturbing contracts and property, and involving everything in inextricable confusion, simply because some abstract principle of law has been incorrectly established in the outset. The books are full of cases in which learned Judges have acknowledged the errors committed by themselves or their predecessors, and at the same time refused to overthrow the rule established. That Judge, who, from petty vanity, and the sake of showing himself more wise and learned than his predecessors, would overturn a rule which for years had settled the rights of property, should be regarded as the common enemy of mankind, and unworthy of the high trust that had been confided to him.

I now proceed to examine the question whether San Francisco was a pueblo, and whether in that capacity it was the owner of municipal land, with the disposition of which her officers were invested.

At an early period after the conquest of Mexico, regulations were made by the Spanish Crown for the reward of further discoveries, and the settlement of the country. These decrees are collected in the *Recopilacion de las Indies*.

A regulation was promulgated in 1523, to be found in Liber 4, title 7, law 7, of the Laws of the Indies, which authorized grants on certain conditions, to the founders of towns and pueblos. It is as follows: " The tract of territory granted by agreement to the founders of a settlement shall be distributed in the following manner: They shall, in the first place, lay out what shall be necessary for the site of the town and sufficient commons, and abundant pasture for the cattle to be owned by the inhabitants, and as much besides, for that which shall belong to the town, (*propios*.) The balance of the tract shall then be divided in four parts; the one to be selected by the persons obligated to form the settlement, and the remaining three parts to be divided in equal portions among the settlers." Law 11, same title, provides as follows: " The lots shall be distributed among the set-

Welch *v.* Sullivan.

tlers by lot, beginning with those adjoining the main square, and the remainder shall be preserved, so as to give as rewards to new settlers, or otherwise, according to our will, and we command that a plan of the settlement be always made out." Law fourteenth, of same title, further provides : " After having laid out a sufficient quantity of land for commons of the town (*exido*) conformably to what is provided in that behalf, the persons authorized to make the discovery and settlement, shall lay out reservations, (*dehesas,*) adjoining the commons, (*exidos,*) for oxen, horses, and cattle, to be slaughtered, as well for the ordinary number of other cattle, which the settlers are bound by law to maintain, and a good deal more besides, which shall belong to the council, and the remainder shall be laid out for cultivation, in tracts equal in number to the town-lots contained in the settlement, and be drawn by lot. And if there be any land suited for irrigation, it shall also be distributed by lot in the same proportion, to the first settlers, and the remainder shall remain vacant, that we may grant them to new settlers. From these lands the Viceroys shall separate those which appear to be fit for reservations (*propios*) for the settlements which have none —the proceeds of which will serve to pay the *corregidores*, leaving always sufficient commons, reservations, and pastures, as is prescribed above, and let it be so executed." 2 White, 47.

We have thus seen that the law of 1523, authorized the formation of towns with *exidos* (commons), and *propios,* municipal lands, the title to which was to be vested in the inhabitants of the towns. It required a further regulation to fix the extent of the pueblo.

This was done in 1538, by a decree, which is found in Lib. 4, tit. 5, law 6, of the Laws of the Indies, to the following effect:

" If the situation of the land be adapted to the founding of any town, to be peopled by Spaniards, with a council of ordinary alcaldes and regidores, and if there be persons who will contract for their settlement, the agreement shall be made upon the following conditions : That within the prescribed time, it shall comprise, at least, thirty heads of families, each of whom to possess a house, ten breeding cows, four steers, etc.; he shall, moreover, appoint a priest to administer the sacrament, who, the first time, shall be of his choice, and afterwards according to our royal patronage ; he shall provide the church with ornaments and articles necessary for Divine worship; and he shall give bond to perform the same within said period of time ; and if he fail in fulfilling his agreement, he will lose all that he may have built, worked, or repaired, which shall be applied to our royal patrimony, and incur the forfeiture of one thousand ounces of gold to our chamber (*camera*); and if he should fulfill his obligations, there shall be granted to him four square leagues of territory, either in a square, or lengthwise, according to the quality of the

land, in such a manner that when located and surveyed, the four leagues shall be in a quadrangle, and so that the boundaries of said territory be at least five leagues distant from any city, town, or village, inhabited by Spaniards, and previously settled, and that it cause no prejudice to any Indian tribe, nor to any private individual."

Law seven, of same book and title, declares: "If any one should propose to contract for a settlement in the prescribed form, to consist of more or less than thirty heads of families, provided it be not below ten, he shall receive a grant of a proportionate quantity of land, and upon the same conditions."

We have thus seen that any individual might become the founder of a town.

A further regulation was made, authorizing the heads of families to unite and form a pueblo on the same conditions. It is law ten of the same book and title, as follows: "Whenever particular individuals shall unite for the purpose of forming new settlements, and among them there shall be a sufficient number of married men for that purpose, license may be granted to them, provided there be not less than ten married men, together with an extent of territory proportioned to what is stipulated, and we empower them to elect, annually, from among themselves, ordinary alcaldes and officers of the council."

In all these cases, after 1538, the quantity of land dedicated or granted for the purpose of a town, was four leagues, measured from the principal square, one league in each direction, when the situation of the ground admitted of it.

Under these regulations, most of the towns were settled in Mexico, except in a few cases, when there were special grants.

In Coahuilla and Texas, after the revolution in 1821, as it was a matter of doubt whether the Spanish regulation remained in force, a decree was passed that the new towns, settled after the revolution, should have granted to them four leagues, the same as had been previously granted to the old towns.

In addition to the formation of towns by grant to founders, and to families united voluntarily for that purpose, the Viceroys and Governors had the power to found and organize towns given by a decree of the King, Don Carlos, in 1523. It is Law 1, book 4, tit. 13, of the Laws of the Indies, to the following effect:

"The Viceroys and Governors, being thereto authorized, shall lay out for each town or village which shall be newly founded and peopled, the lands and lots which they may require, and the same shall be granted to them as *propios*, without prejudice to third parties. They shall transmit to us information of what they shall have laid out, that we may order the same to be confirmed."

The royal ordinance of 1754, declares: "That from the date of this, my royal order, the power of appointing sub-delegate

judges to sell and compromise for the lands and uncultivated parts of the said dominions, shall belong thereafter exclusively to the Viceroys and Presidents of my royal audiences of those kingdoms, (the Indies,) who shall send them their appointments or commissions, with an authentic copy of this regulation."

The second article provides, "But in regard to lands of community, and those granted to the towns for pasturage and commons, no change shall be made, the towns shall be maintained in the possession of them, and those that may have been seized shall be restored to them, and their extent enlarged according to the wants of the population." 2 White, 63.

This is a clear recognition of the rights of the town to the municipal lands. In the instructions to the intendentes, 2 White, 70, dated in 1784, directing them to make grants of lands, it is said, "And as respects the royal lands, without prejudice to such commons, as by the provisions of Law No. 8, ought to belong to each town or corporation."

It is contended by the counsel for appellant, that Law 1, of title 16, liber 7, of the *Novissima Recopilacion,* quoted in the opinion of Cohas *v.* Raisin, applies only to old Spain, and not to the Indies.

If this were true, it only shows what was the tendency of the law in the Indies, and is a mere repetition of what was repeatedly enacted for Spanish America. The decree is: "Our will and pleasure is, that the cities, towns, and villages, shall retain their rights, revenues, and municipal domains, (*propios,*) and that no grants be made of them; wherefore, we command that all grants of the same, or any part thereof, which we may make to any person, be of no value whatever."

The quotations already made from the laws of the Indies, show that the same principle was repeatedly affirmed with reference to pueblo lands in Spanish America.

A special regulation, however, was promulgated in reference to towns in California, and especially in reference to those places settled as Presidios. In 1791, Pedro de Nerva possessed the power of Viceroy, and directed the following decree to Governor Romen:

"In conformity with the opinion of the Assessor of the *Comandancia Generale,* I have determined, in a decree of this date, that, notwithstanding the provisions made in the eighty-first article of the Ordinance of *intendentes,* the Captains of the Presidios are authorized to grant and distribute house-lots and lands, to the soldiers and citizens, who may solicit them, to fix their residence on. And, considering the extent of four common leagues, measured from the centre of the Presido Square, viz.: two leagues in every direction, to be sufficient for the new Pueblos, to be formed under the protection of said Presidios, I have

likewise determined, in order to avoid doubts and disputes in future, that said Captains restrict themselves henceforward to the quantity of house-lots and land within the four leagues already mentioned, without exceeding in any manner said limits, leaving free and open the exclusive jurisdiction belonging to the *intendentes* of the Royal Hacienda respecting the sale, composition, and distribution of the remainder of the land in the respective districts.

And that this order may be punctually observed and carried into effect, you will circulate it to the Captains and Comandantes of the presidios of your province, informing me of having done so.

CHIHUAHUA, March 22, 1791.

PEDRO DE NERVA.

To Señor Don Joseph Antonia Romen."

On the twenty-seventh of October, 1785, the Fiscal (Attorney-General) at Chihuahua, recommended that "The allotting of tracts of land (*sitios*) for cattle, which some settlers in California claim, and the Governor proposes in his official communication of the twentieth of November, 1784, cannot nor ought not to be made to them within the boundaries assigned to such pueblo, which, in conformity with the law 6, tit. 5, liber 4 of the recopilacion, must be four leagues of land in a square or oblong body, according to the nature of the ground, because the petition of the new settlers would tend to make them private owners of the forests, water, timber, wood, and other advantages of the lands which may be assigned, granted, and distributed to them; and to deprive their neighbors of these benefits, it is seen at once that their claim is entirely contrary to the directions of the aforementioned laws, and the express provisions in article eight of the instructions for settlements (*poblaciones*) for the Californias, according to which all the waters, pastures, wood, and timber, within the limits which, in conformity to law, may be allotted to each pueblo, must be for common advantages, etc., that all the new settlers may enjoy and partake of them, maintaining thereon their cattle, and participating of the benefits that arise."

On the twenty-first of June, 1786, the Commandant-General transmitted this opinion to Governor Fages, and directed him to proceed to grant accordingly.

#### DOCUMENT IN THE UNITED STATES LAND OFFICE.

The regulations of Petic, made to apply to all towns subsequently established, ratified by a royal order of 1789, declare in Article 6th :

"The tract of four leagues granted to the new settlement, being measured and marked out, its pastures, woods, waters, privileges, hunting, fishery, stone-quarries, fruit-trees, and other

privileges, shall be for the common benefit of the Spaniards and Indians residing therein, and in its suburb or village, as shall also be the pastures of the lands," etc.

It is also well known, that throughout Spanish America it was contemplated that, after the Indians had been under the care of the Church for several years, and instructed in religion and the arts of civilization, they should be emancipated, and the mission establishments converted into pueblos. In the instructions of the Viceroy, the local government in California, dated August 17, 1773, he says: "As the mission settlements are hereafter to become cities, care should be taken, in their foundation, that the houses should be built in line, with wide streets and good market-squares." The Viceroy proceeds to confer the power, and the local officers to carry out this plan. He declares: "With the desire that population may be more speedily assured in the new establishments, I, for the present, grant the comandante power to designate common lands, and also even to make individual concessions to such Indians as may most dedicate themselves to agriculture and the raising of cattle; for, having property of their own, the love of it will cause them to plant themselves more firmly.

In the thirteenth article of these instructions, the Viceroy expressly requires the comandante to proceed according to the laws of the Indies, above quoted, as follows: "He must act, in every respect, in conformity with the provisions made in the collection of the laws respecting newly-acquired countries and towns, (reducciones y poblaciones,) granting them legal titles for the owner's protection, without exacting any remuneration for it, or for the act of possession."

The fifteenth article provides expressly that "the missions shall be converted into pueblos, with all the rights and privileges of other towns." Article fifteenth: "When it becomes expedient to change any mission into a pueblo, the comandante will procede to reduce it to the civil and economical government, which, according to the laws, is observed in the other pueblos of this kingdom, giving it a name, and declaring, for its patron, the saint under whose auspices and honorable protection the mission was founded."

In the "regulations for the government of the province of California, by Don Felipe de Neve, Governor of the same, dated in the royal presidio of San Carlos de Monterey, June 1, 1779, and approved by His Majesty, in a royal order of the twenty-fourth October, 1781," which provide for the settlement of the country, the regulation of the missions and presidios, and the formation of pueblos, the fourth article declares: " The house-lots to be granted to the new settlers (pobladores) are to be designated by government in the situations and of the extent, corresponding to the locality on which the new pueblos are to be established, so that

a square and streets be formed agreeable to the provisions of the laws of the kingdom, and conformable to the same; competent common lands (*exidos*) shall be designated for the pueblo and pasture-grounds, with the sowing-lands that may be necessary for municipal purposes, (*propios.*)

The fifth article further provides: " And of the royal lands, (*realengas,*) as many as may be considered necessary shall be separated for the *propios* of the pueblo, and the remainder of these, as well as of the house-lots, shall be granted in the name of His Majesty, by the Governor, to those who may hereafter come to colonize."

The eighteenth article directs the Governor for the first two years to appoint " ordinary alcaldes and other municipal officers," and " for the following ones, they shall appoint some one from amongst themselves, to the municipal offices, which may have been established, which directions are to be forwarded to the Governor for his approbation." Rockwell, 445.

The Mexican government always acted upon the idea that the missions were to be converted into pueblos, and Governor Figueroa, issued an order to that effect, as to the missions in California in 1834. Rockwell, 456.

The Republic of Mexico, after the revolution of 1824, fully recognized the rights of the towns in their commons, pastures, and municipal lands.

The second article of the Colonization Law of 1824 enacts, " The objects of this law are those national lands, which are neither private property, nor belonging to any corporation or pueblo, and can therefore be colonized." The provision fully recognizes the fact that pueblos were the owners of land in property, which could not be the subject of grant.

It will thus be seen that under the laws of the Indies, whenever a pueblo was formed by a grant to a founder, or the union of ten or more families, or the foundation of a presidio, or the secularization of a mission, each pueblo was entitled in property to certain tracts of land within the limits of the town, to be set apart to them, called (*exidos,*) commons, (*dehesas,*) pasture-grounds, and (*propios,*) municipal lands, and that they were so entitled by virtue of their organization as pueblos.

The presidio of San Francisco was founded in September, one thousand seven hundred and seventy-six. At that time each pueblo was entitled to the extent of four leagues as an exterior boundary. Subsequently, in one thousand seven hundred and ninety-one, as already shown, these limits were extended to two leagues in every direction from the centre as the limit of a presidio pueblo. In October, one thousand seven hundred and seventy-six, the Mission of Dolores was founded. It has already been shown that the secularization of each mission was contemplated from its foundation, and that it was to be also converted

into a pueblo. This did not leave quite space enough to the presidio of San Francisco for a four-league pueblo. It is reasonable to believe that a line was early established between the presidio and the mission, and the same seems to have been substantially adopted by M. G. Vallejo, in one thousand eight hundred and thirty-four, when he established the line of the pueblo of San Francisco, as will be seen by reference to the pueblo documents on file in the United States Land Commission, and now deposited in the United States Surveyor-General's office.

The place called *punta* Yerba Buena, upon which the city of San Francisco now principally stands, has been given an undue importance in the controversy. It seems never to have been a pueblo, separately from the *presidio*. It is within the limits of the four leagues, pertaining to the pueblo of the presidio. Neither are the rights of that pueblo in any way affected by the fact that most of the population removed from the presidio post to the Yerba Buena after one thousand eight hundred and thirty-five. It was part of the same pueblo politically and in a jurisdictional point of view, being within its original limits.

The presidio always had a considerable population, from the date of its foundation until long after the Mexican revolution. In one thousand eight hundred and two, Humboldt reported the population to be nearly four hundred. *Vide* Senate Doc., and Jones' Report.

It is strongly urged, in the brief of the appellants, that pueblos had no right to·sell or grant their common or municipal lands. It will appear from the foregoing quotations from the laws of the Indies, that they had a right to dispose of certain lands within the pueblo limits, to defray municipal expenses. The Spanish regulations devoted the property to that purpose.

It is also to be observed that the decree of the Cortes of 1813, directs the pueblo lands, or at least a portion of them, to be granted and converted to private ownership.

The Departmental Assembly of California, by a decree of September, 1835, authorized the ayuntamiento of the pueblo of San Francisco to grant lots, not exceeding one hundred varas. It is to be observed that this decree is directed to the alcalde of San Francisco, not of the pueblo of Yerba Buena, and is an authority in the place or part of the pueblo of San Francisco, named Yerba Buena. It is a legislative declaration that the pueblo had *propios*, (municipal lands,) and *arbitrios*.

This decree was a regulation of the affairs of a public corporation, as they may be regulated by legislation, both in England and in this country. The decree is as follows :

" The most Excellent, T. Dep., in Sessions the 22 September, approved that the Ayunt'o of the pueblo may grant lots, which do not exceed 100 varas, for the building of houses in the place

named Yerba Buena, at the distance of 200 varas from the shore of the sea, paying to that Ayunt'o the fees which may be designated to him, as pertaining to the propios and arbitrios, and being subject to observe the order for forming the town, in lines, in accordance with the ordinances regulating the police, which I communicate to you, that you may make it known to the inhabitants of that pueblo, in order that they may not apply with their memorials to this political government, as it is one of the favors which the Ay'to can grant.

JOSE CASTRO.

MONTEREY, Oct. 26, 1835.

Directed to Señor Alcalde de San Francisco de Asis."

It is a mistake to say that the confirmation to the city of San Francisco, by the Land Commissioners, does not proceed on the ground of a grant. The whole legal effect of the act of Congress of third March, 1851, was, as a matter of evidence, to create a presumption of grant to a town of all the vacant lands within its limits, as recognized or established on the seventh July, 1846, to such towns as were settled previous to that time.

The act declares, that "the fact of the existence of the said city, town, or village, on the said seventh July, 1846, being duly proved, shall be *prima facie* evidence of a grant to such corporation, or to the individual under whom the said lot-holders claim; and where any city, town, or village, shall be in existence at the time of passing this act, the claim for the land embraced within the limits of the same, may be made by the corporate authority of the said city, town, or village."

The majority of the commission decided that the evidence of a grant was sufficient, under the act, to authorize the presumption of one, according to the Vallejo line. The opinion concludes as follows: "These conclusions bring the case, in our opinion, clearly within the operation of the presumption raised in favor of a grant to the town by the fourteenth section of the act of third March, 1851, and entitle the petitioner to a confirmation to the land contained within the boundaries described in the document above-mentioned."—[The Zamarano Document.]

Parties who contest a grant, by competent authority, within the city limits after this confirmation, which is now made final, the appeal having been dismissed by authority of the government, must rely on a sufficient title issued by competent authorities previous to the seventh of July, 1846.

If the proper officer has granted, within the acknowledged limits, his grant is *prima facie* valid, and conveying land which he had a right to grant.

Whether the *propios* of a pueblo could be sold or not, at forced sale, under the Mexican law, the act of Congress of 1851, creates a new tenure, and operates a confirmation in fee to the city.

And especially after the adoption of the common law in 1850, the municipal and common lands of pasturage were liable to execution-sale.

It is urged that the city had no title to the property sold under the judgment, and that, therefore, the sheriff's deed is not sufficient to authorize a recovery in ejectment. If the confirmation of the United States commissioners is to be regarded as of any value, it establishes the fact that the city had a title on the seventh of July, 1846. The decision is based entirely on that ground. But if it were otherwise, and the act of Congress of 1851 is to be treated as a grant or release of the interest of the United States to the city of San Francisco, there was title in the city, either legal or equitable, at the date of the execution-sale. The judgment of Peter Smith was recovered on the eighteenth September, 1851, after the date of the act of Congress, which was the third of March, of the same year. The property was sold by the sheriff on the thirtieth of January, and first and second of February, 1852.

After the adoption of the common law in 1850, it cannot admit of reasonable doubt that the town-lots of the city held for grant, could be siezed and sold on execution to satisfy judgments against the city.

It must also be borne in mind that in 1851, the Legislature expressly authorized the city authorities of San Francisco to alienate the lands and vacant lots belonging to the city.

It must be apparent that the act of Congress of the third of March, 1851, would enure to the benefit of alcalde grants made by the proper authorities, subsequent to the seventh July, 1846.

These grants were sales; and it is well settled in the civil law in force in California, until the adoption of the common law by the Legislature of 1850, that a subsequently acquired title will enure to the benefit of the prior vendees of the city.

"Although the sale of another's property be null, yet the subsequent acquisition of the title by the vendor vests it at once in the vendee, who cannot afterwards sue for a recision of the sale." 2 Hen. La. Dig., p. 1380; 12 M., 187; ib., 649; 5 N. S., 247; 9 La., 99; 12 ib., 170; 5 An., 532.

There does not seem to be any ground for doubting that the Pueblo of San Francisco had pueblo lands previous to the seventh July, 1846, which the ayuntiamento at one time and the alcaldes at another might grant. At the time of the change of government the alcaldes had the power to grant fifty-vara lots within the pueblo. In respect of the municipal laws so granted, the alcalde acted as the officer of the corporation, upon whom authority for that purpose had been conferred by the government and Departmental Assembly. It is a misnomer to call these titles American alcalde grants. They were the grants of the pueblo of its own property, which it had a right to transfer, by virtue

14

of the municipal law, which was continued in force by the new sovereign until 1850. As to all grants made by the alcaldes, it must be presumed that they were of municipal lands which these officers had a right to grant, until the contrary is shown.

It is urged that the fees of the ungranted lots within the city remained in the Mexican government, because the municipal and common lands were never actually assigned to the pueblo by a survey or judicial possession made by competent officers.

The practical force of this argument is not perceived. It is perhaps true that the Governors might grant within the pueblo, until the measurement was had; but under the Spanish and Mexican law, the right of the pueblo to have the municipal and common lands assigned, was an acknowledged equity. The United States succeeded to the fee charged with this equity, and are bound to respect it by the treaty with Mexico.

The act of Congress of 1851 removes all difficulty about the boundary, by acknowledging this right; and by releasing to the present city all lands vacant and ungranted on the seventh of July, 1846, removed all difficulties on the subject. Under the decisions of the Supreme Court of the United States, this release was equivalent to a legislative grant upon which ejectment can be maintained, as well as upon the patent, which is only a ministerial act, while the other is the direct act of the sovereign, through the legislative department. See Grignon et al. *v.* Astor et al., 2 Howard, 319, in which the Supreme Court of the United States held that " a title to land becomes a legal title when a claim is confirmed by Congress. Such confirmation is a higher evidence of title than a patent, because it is a direct grant of the fee, which had previously been in the United States."

I have thus attempted to show the right of the pueblo of San Francisco to municipal lands, and that, whether the fee of the same under either the Spanish or Mexican *regime* remained in the supreme government or passed to the pueblo, the act of Congress of 1851 operated a conveyance of such lands to the city of San Francisco. I have attempted to demonstrate that grants made after 1846, by American alcaldes, as they are called by the learned counsel, were not void; that the municipal laws remained in force during the occupation of the country by American troops, and that the act of disposing of the private property of a municipal corporation was not political.

It is contended, however, that the decision in Woodworth *v.* Fulton was sustained by this Court, in the subsequent cases of Clarkson and Vanderslyce *v.* Hanks and Leese, and Vallejo *v.* Clark. In the first case, the question under discussion was neither raised nor argued. In the second, the right of the pueblo to lands within her territorial limits was not relied on, but the case went off on the point that, conceding the power of the Governor to grant within the pueblo limits, the grant in question

only conveyed an inchoate title, which was insufficient to sustain an action of ejectment.

But the fact is directly the contrary. In spite of this decision, men maintained their rights by force of arms; and alcalde grants, whether made before or after the occupation of the country by Americans, were regarded as good titles to the land they purported to convey.

As a specimen of the reasoning upon the opinion of Cohas *v.* Raisin, it is only neessary to transcribe the following passage from the appellant's brief:

" The opinion commences," says the learned counsel, " with the following quotation from the Spanish law ' Our will and pleasure is, that cities, towns, and villages shall retain their rights and revenues, and municipal lands, (*propios*,) and that no grants be made of them, and we command that all grants of the same, or any part thereof, which we make to any person, be of no value whatever.'

" I would, in all seriousness, ask, what support for the doctrine sought to be sustained, can be derived from this law ? In order to be of any avail to the opinion, the reasoning must be this: It is the will and pleasure of the King, that cities, towns, and villages shall retain their rights, revenues, and municipal lands, therefore they have a right to part with them; but, says the King, it is our will and pleasure that no grants be made of such lands, therefore a grant of such lands by an American alcalde is good. Again, says the King, we command that all grants of the same, or any part thereof, which we may make to any person, be of no value whatever—consequently, says the opinion, because grants by the King are void, grants by an American alcalde are valid. I might proceed with the rest of the paragraph, in the same way, showing an unmeaning citation of authorities, upon points which were never doubted or disputed, or false deductions from such authorities, if they can be considered as having any applicability at all."

Now, on examination of the decision of Cohas *v.* Raisin, it will be observed that this quotation was only introduced for the purpose of showing that towns and cities might own municipal lands, and that their right to the same was so completely vested, that even the sovereign could not dispose of them; and the inference from this, if any is to be drawn, is that the prime right of disposition of such property was in the municipal authorities, and not in the sovereign power of the State.

The main difficulty of the counsel seems to rest upon the supposed fact that American alcaldes could not grant the lands of the pueblo. This case does not involve the question; the plaintiff does not claim by virtue of an alcalde grant, but through a judicial sale, made after the passage of the act of Congress.

Were it otherwise, we have attempted to demonstrate that these grants are valid.

This new-born zeal to defend the old Californians against the usurpations of their American conquerors, is commendable, in the highest degree ; but, like most after-thoughts, it comes too late. Disguise it as you will, when stripped and exposed, it is only a ruse to take from the early immigrant the products and acquisitions of his labor, for the benefit of those who came to the State at a more recent period, or to compel the industrious and fortunate to share with the idle and improvident.    In fact, it goes beyond this, to the extent of holding that those who came here before the year 1849, and particularly the original inhabitants, are disqualified from holding land altogether.

In speaking of the case of Woodworth v. Fulton, and Cohas v. Raisin, the counsel remarks, that : " The former case, it is true, encouñtered, at first, a violent, bitter, and unscrupulous hostility ; but that has passed away, and 'the sober, second thought of the people' has reversed the respective positions which Woodworth v. Fulton, and Cohas v. Raisin, at first occupied."

I, at least, have seen no symptoms of a change from the day that that opinion was announced, and if I were in the habit of being governed by popular clamor, instead of what I believe to be principles of law, I would cheerfully abide the voice of the people on this question, so fully am I satisfied that there is a sufficient sense of justice and honesty in the masses to repudiate so gross an outrage upon private rights, as would be the case if Woodworth v. Fulton should be again declared the law of the land.    That opinion created consternation and alarm ; it unsettled the laws of property, despoiled men of their possessions, and introduced into a peaceful community disgraceful scenes of riot and bloodshed, calling down upon its authors the anathemas of the whole people.    The decision of Cohas v. Raisin, was an olive branch of peace ; it restored confidence in landed property, gave security to business operations, and quieted the angry passions of those who imagined, not without cause, that they had been improperly stripped of their property.

The question now remains to be determined, whether, admitting the case of Woodworth v. Fulton was law, this Court should adopt it, and abandon the case of Cohas v. Raisin.

As has been previously remarked, Courts are not justified in overruling their former decisions, and unsettling established principles, simply because error may have intervened.    A wise and prudent Judge will always examine the consequences which must result from the change, and the effect it will have upon the community, and unless the inconveniences arising from the error greatly outweigh the advantages which would result from an adherence to the rule, the decision will be permitted to stand

I have stated what is a part of the history of this State, that the decision of Woodworth *v.* Fulton was never acquiesced in either by the bar or the public; that it was subsequently overruled, and that, since that time, the case of Cohas *v.* Raisin has been often affirmed by this Court. (See Leonard *v.* Darlington, and Dewey *v.* Lambier.) The whole community has acted upon the faith of these decisions, and it has probably never entered the brain of any sane man, except, perhaps, that of the appellant, that the rule thus firmly established would be overturned.

The practical consequences of such a change would be, conceding the appellant's position, that no title has passed out of the city since its occupation by American troops, and that every title made since that time is void. That when the city acquires the title to said lands, she may dispose of them for her own benefit, leaving those who have bought and improved in good faith without remedy. It goes further; if the city has any title by virtue of the act of Congress, and can by her charter make a voluntary disposition of her lands, then all such lands are relinquished by virtue of the so-called "Van Ness ordinance," to those in actual possession, without regard to rights of third parties.

The consequences of such a rule would be to destroy every title in the city, with the exception of the few that were made anterior to 1846, and to drive the present owners to seek relief from the city authorities. And for whose benefit, let it be asked, is this Court requested to perpetuate so foul a wrong? For the benefit of those, for the most part, who set up no right to the land, except so far as may be derived through the divine right of squatting, or appropriating their neighbor's property!

A brief reference to the history of the country, will serve to explain the pretended equities of those who are so loud in their denunciations of the decision in Cohas *v.* Raisin. In 1848, '49, the immigration which was drawn to California was composed, principally, of those who were anxious to better their fortunes by labor in the mines. Land was of little or no value, and passed, by the mere delivery of possession. Soon, the wants and necessities of trade began to require fixed places of business. San Francisco, at that time the commercial metropolis of the State, was supposed to be the owner of certain municipal lands. This was the opinion of its oldest inhabitants. The right to dispose of these lands was supposed to be vested in its municipal officers. This right was conceded and recognized by common consent. Access to the laws regulating the subject, was at that time impossible, but relying upon the traditions of its oldest inhabitants, the people elected officers, who undertook to dispose of the public property, for the common benefit. The land was laid out into lots, which were disposed of at public and private sale. These sales were confirmed by the old municipal govern-

ment, and their validity has never been questioned by the city of San Francisco since it was incorporated by the Legislature. On the other hand, for a period of nearly seven years, she has not only slept on her rights, but by various acts has indirectly recognized those sales, and though it may be admitted that a portion of the proceeds was improvidently squandered, yet by far the greatest part went into the general fund, and was spent in maintaining hospitals, police, the improvements of streets, and for various other municipal purposes. Under this system, the people of San Francisco ministered to the wants of the sick and needy immigrant, who was cast upon their shores; they maintained the law, preserved peace, protected life and property, and laid the substantial foundations of a great city, which is yet destined to rival the marts of the old world. Are those who thus purchased in good faith, and for a valuable consideration, to be denied their property, because some one with full knowledge of all the facts may choose to settle upon it, and deny the authority of an American alcalde to grant the same?

The city of Sacramento is another fit illustration of this doctrine. Sutter's grant was known both in the United States and Europe before the discovery of gold. The immigrant of 1849 found him in the possession of the land on which the city of Sacramento now stands, claiming the same by title from the Mexican government. Nothwithstanding this, they suddenly ascertain that the Mexican government had no right to grant so large a tract of land, and if it had, that New Helvetia is not within its limits, and, therefore, they set themselves to work to dispossess him, and claim to be bona fide settlers on the public lands. If Sutter or his grantees should recover, after years of litigation, they claim the value of the improvements which they pretend to have put upon the land without notice, when the knowledge of his claim was a part of the history of the country.

Those who have settled in good faith upon lands, believing them to belong to the United States, without notice of an adverse title, ought to be protected; in fact, are protected by the rules of law and equity. Such men are entitled to the sympathy of the community and the consideration of the Courts. But those who, knowing a party's title and possession, attempt to determine its validity for themselves, and enter without regard to other's rights, are entitled to no consideration whatever. It is a misnomer to call them settlers.

Judgment affirmed.

TERRY, J.—I concur in the judgment of affirmance in this case, for the reason that the principles involved in the case of Cohas v. Raisin, have been the rule of decision in this State for four years; that large investments have been made, and valuable interests acquired upon the faith of that decision, and the

effect of overruling it at this time would be to unsettle the title to a large portion of the most valuable real property in the State, and thus open the door to endless disputes and litigation. I think, therefore, that the opinion in that case should be regarded as a final settlement of the questions passed upon.

It is urged by appellant that the same reasons existed for applying the rule of *stare decisis* to the case of Woodworth *v.* Fulton, which was overruled by Cohas *v.* Raisin, and that inasmuch as this Court has, in that and some other instances, departed from the rule, we should now proceed to determine the questions raised by the record in this case, as though they were presented for the first time.

To this proposition I cannot assent. I think in all cases of this nature, involving questions affecting the title to real estate, it is better that a uniform rule of decision should be established and adhered to; that the law of property should not be made to vary so as to conform to the individual opinions of each succeeding Judge or Court, nor the tenure of lands to depend upon the result of popular elections. Whatever views I may entertain as to the correctness of the conflicting opinions in Woodworth *v.* Fulton, and Cohas *v.* Raisin, considerations of public policy and justice, as well as regard for individual rights acquired under the law as announced by the highest judicial tribunal, imperatively demand of us a strict adherence to the doctrines of the latter case.

BURNETT, J.—I concur in affirming the judgment of the Court below on two grounds: First, That the title to the property in question, vested in the city of San Francisco by virtue of the act of Congress. Second, That the title of the city passed to the purchaser under the sheriff's sale.

Neither of these grounds are discussed by the learned counsel of defendant. And as to the questions decided in the two cases of Woodworth *v.* Fulton, and Cohas *v.* Raisin, they are not necessarily involved in this case, and I express no opinion in respect to them.