## Case No. 15,302.

### UNITED STATES v. HARE.

[1 Cranch, C. C. 82.] [1]

Circuit Court, District of Columbia. April Term, 1802.

#### COMPETENCY OF WITNESS—INTEREST.

Upon a trial for larceny, the owner of the stolen goods is a competent witness in chief, upon filing with the clerk of the court, for the use of the prisoner, a release of the witness's right to one half of the fine which the court might impose.

[Cited in U. S. v. M'Cann, Case No. 15,655; U. S. v. Tolson, Id. 16,530. Followed in U. S. v. Brown, Id. 14,657.]

Indictment [against John Hare] for stealing a pocketbook and money from Anthony Conrad. This indictment was under the act of congress of April 30, 1790, § 16 (1 Stat. 112), which imposes a fine of fourfold the value of the goods stolen, and gives one half of that fine to the owner of the goods.

Mr. Mason, for the United States, offered Conrad, the owner of the goods as a witness, and produced a release from Conrad to the prisoner of the half of the fine which might be imposed.

Mr. Jones, for the prisoner, objected that the release cannot operate to convey a mere right to an uncertain future, contingent possibility. Besides, as it is not delivered to the prisoner, he will not accept it.

## Case No. 15,303.

### UNITED STATES v. HARE et al.

[4 Sawy. 653.] [2]

Circuit Court, D. California. Oct. 28, 1867.

LAND TITLES IN CALIFORNIA—NATURE OF PUEBLO TITLES — EXECUTION AND SALE — CONTROL BY GOVERNMENT — GRANTS AND RESERVATIONS BY MILITARY AUTHORITIES—SAN FRANCISCO PUEBLO LANDS.

1. The existence of a Mexican pueblo at the site of the present city of San Francisco, on July 7, 1846, its possession of an interest in lands to the extent of four square leagues, and the succession of the present city to such interest, having been judicially settled in a controversy between the city and the United States, are matters no longer open to discussion.

2. Lands within the limits of the pueblo of San Francisco were not subject to levy and sale under judgment and execution against the city.

3. The lands of the pueblo of San Francisco were not held in absolute property, with full right of alienation and disposition, but were subject to the control and disposition of the government until the title passed to private parties; and this right of control and disposition, which existed in the former government, passed upon the cession of the country to the United States, and could afterward be exercised by them at any time before the property had passed to third parties by the action of the pueblo authorities in accordance with existing laws.

4. The officers of the United States army who occupied California prior to the organization of the state government, had no power to grant or dispose of, or to reserve from grant or disposition, any portion of the pueblo lands or any portion of the public property of the United States; they could in no respect impair any rights which the United States may have acquired over either by the conquest or might subsequently acquire by treaty.

5. The attempted grant to San Francisco by Gen. Kearny, on March 10, 1847, of the beach and water lots was an act beyond his authority to execute, and passed no interest whatever.

6. The attempted selection by Major Hardie, on July 18, 1847, of a government reserve at Rincon Point in San Francisco, was invalid: such appropriation could only have been made by act of congress or order of the president.

7. While the president of the United States was authorized in particular cases to reserve from sale for public uses portions of the public lands, no such power was vested in the head of any subordinate departments of the government. The secretary of the treasury could not execute nor approve of a lease of any property belonging to the United States without special authority of law.

8. Parties who obtained conveyances from the city of San Francisco, whilst its claim for pueblo lands was pending before the United States tribunals, took whatever interest they acquired subject to the determination of the claim.

9. The final decree in the San Francisco pueblo case took effect, by relation, on the day when the petition was presented to the land commission in July, 1852, and is to be considered as if entered on that day.

10. The term "grants" in the final decree of the San Francisco pueblo case, declaring that the confirmation is in trust for the benefit of lot holders under grants from the pueblo, town or city, comprehends all previous conveyances from the city.

This was an action for the possession of certain real property situated on Rincon Point, in the city of San Francisco, being a portion of lots five and six of the block lying between Folsom and Harrison streets, and between Main and Spear streets. It was tried at the October term, 1867, by the court, without the intervention of a jury by stipulation of the parties. On the trial the plaintiffs produced and gave in evidence the proceedings and decree in the San Francisco pueblo case, and proved that the premises in controversy were within the limits defined by said decree. They also produced, proved and read in evidence the following documents, numbered from 1 to 14 inclusive:

(No. 1.)

I. Brigadier-General S. W. Kearny, governor of California, by virtue of authority in

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

me vested by the president of the United States of America, do hereby grant. convey, and release unto the town of San Francisco, the people or corporate authorities thereof, all the right, title, and interest of the government of the United States. and of the territory of California in and to the beach, and water lots on the east front of said town of San Francisco, including between the points known as the Rincon and Fort Montgomery, excepting such lots as may be selected for the use of the general government by the senior officers of the army and navy now there; provided the said ground hereby ceded shall be divided into lots and sold to the highest bidders, after three months notice previously given. The proceeds of said sale to be for the benefit of the town of San Francisco. Given at Monterey, capital of California. this tenth day of March, 1847, and in the seventy-first year of the independence of the United States. S. W. Kearny, Brigadier-General and Governor of California.

(No. 2.)

Headquarters 10th Military Department.
Monterey, California. June 23. 1847.

Sir: Colonel Mason has not yet officially learned that any selections have been made of lots in the town of San Francisco, known as the beach and water lots granted to said town for sale, excepting such as should be selected for the use of the general government by the senior officer of the army or navy. The time of sale under the decree of General Kearny of March 10. 1847, rendered it necessary that the selection be made soon, and Colonel Mason wishes you to consult with Commander Biddle, or other senior naval officers that may be on the station, and to select in accordance with the terms of the grant. if it has not already been done, the lots best suited for wharves both for army and navy purposes, with space enough for all the buildings that it may be necessary to erect hereafter. A suitable lot should also be selected for a custom-house with the storehouses that it may require. Colonel Mason wishes these selections to be made so far as the army is concerned. and officially communicated to the alcalde of the town before the day of sale.

I have the honor to be your most obedient servant,  W. T. Sherman,
1st Lt. 3 Art'y, A. A. A. Gen'l.

Major James A. Hardie, Com'd in San Francisco.

(No. 3.)

Headquarters Nor. Mil. Department.
San Francisco. California. July 18, 1847.

Sir: In obedience to orders from his excellency the governor, Colonel R. B. Mason, I have the honor to inform you that 1 have selected for the use of the government the following lands in the town of San Francisco: All that portion of Rincon Point not divided off into lots and marked "Government Reserve" upon the map entitled "Map of the beach and water lots of San Francisco, A. D. 1847," now in the alcalde's office of San Francisco. Also, all the beach and water lots bounded by streets entitled Montgomery, Washington, and Jackson streets, on a map entitled "Map of San Francisco," now in the alcalde's office, and the bay running out into deep water and marked on the aforesaid map of beach and water lots "Government Reserve." And also all the beach and water lots bounded by streets entitled Sansome. Broadway, and Pacific streets on the aforesaid map of San Francisco, and the bay running out into deep water and marked "Government Reserve" on the aforesaid map of beach and water lots of the town of San Francisco.

I am sir. very respectfully, your obedient servant,
(Signed)  Jas. A. Hardie,
Major 1st N. Y. Reg't Volls.

To Alcalde of the Town of San Francisco, California.

(No. 4.)

Headquarters 10th Mit'y Dep't,
San Francisco. Cal'a. Sept. 30, 1847.

Sir: You will be pleased neither to grant nor to give any deed for any town lots or other land to the southward of the Rincon Point and eastward of a line commencing at the north-west corner of the government reserve, at the said Rincon Point, and running south eleven degrees west (S. 11 W.) with the true meridian. The land eastward of the above-named line is intended for the use of the United States government. the southern boundary of which will be more particularly described when the town surveys are more fully completed.

I have the honor to be your obd't serv't,
(Signed)  R. B. Mason.
Col. 1st Dragoons. Gov. California.

To George Hyde, Esq., Alcalde of San Francisco.

(No. 5.)

Headquarters 10 Mil. Dep't.
Monterey, Cal.. Aug. 9, 1849.

Captain: I am instructed by the commanding general to say that you will cause the government reserves at San Francisco to be properly marked and notice to be given in one or more of the papers published in that town forbidding trespassers. by the erection of buildings, or in any other manner whatsoever. Mr. Thompson and Mr. Steinberger are the only persons authorized to occupy any portion of these lands. and without authority communicated to you through or from department headquarters, you will permit no one else to occupy them.

Very respectfully, your obedient servant,
Ed. R. S. Canby. Ass't Adj't Gen'l.

Capt. E. D. Keyes, 3d Artillery, San Francisco.

(No. 6.)

Headquarters 10th Mil. Dep't,
Monterey, Aug. 23, 1845.

Captain: Your communication of the seventeenth inst., and its inclosures, were received last night, and I am directed by the commanding general to say that his instructions to you of the ninth inst., were not more definite because the papers in relation to the claim of Mr. Thompson, and the permission given Mr. Steinberger to occupy a portion of the reserve, are, or should be on file at your post, or in the assistant-quartermaster's office of San Francisco. By the decisions of Generals Mason and Riley, the former and present governors of California, "occupancy of the house," commonly known as the "Kanacka House," and "a right of way to the beach," has, under certain restrictions, been guaranteed Mr. Thompson, "until his claim be submitted to the United States government, or decided by the proper tribunals." Beyond this his title has not been and will not be recognized, and you are desired to apply to Mr. Billings, attorney-general for California, for any assistance that may be deemed necessary to protect the right of the United States to this property. The reservation at Rincon Point, and any other public lands that there may be at San Francisco, are included in your instructions of the ninth inst.

Very respectfully, your ob'd't serv't,
Ed. R. S. Canby, Ass't Adj't Gen'l..

Capt. E. D. Keyes, 3d Art'y, Commd'g Residio, San Francisco.

(No. 7.)

Government Reserve, by Capt. E. D. Keyes. U. S. A., to Theodore Shillaber: This indenture, made this twenty-seventh day of November, in the year of our Lord one thousand eight hundred and forty-nine, between Captain E. D. Keyes, U. S. army, commanding at San Francisco. Upper California, and Theodore Shillaber, of the same place, witnesseth, that the said E. D. Keyes, as agent of the United States, by and with the authority of Brevet Brigadier General Bennett Riley, U. S. army, commanding the 10th military department, doth hereby lease, demise, and let to the said Theodore Shillaber, his heirs and assigns, all those lots, parcels, and blocks of ground in the town of San Francisco, Upper California, which have hitherto been set apart, indicated or known as "government reserve," and which are embraced: (1) By Montgomery street on the west; Jackson street on the north; Washington street on the south; and the limits of the town or deep water on the east; and (2) by what is commonly known and indicated on the map of said town as "Rincon Point;" the second piece or parcel of ground embracing all that has been heretofore set apart as government reserve on "Rincon Point" and its immediate neighborhood. To hold for the term of ten years from the twenty-seventh day of November, A. D. one thousand eight hundred and forty-nine, subject to the following conditions and exceptions, to wit: First. The said lessee yielding and paying to the officer of the quartermaster department on duty at San Francisco, or to such other persons as may be duly appointed to receive it for the benefit of the United States the sum of two thousand dollars for each and every year. Second. To acquire for and surrender to the United States at the expiration of this lease, all titles or claims belonging to or held by other persons, and all persons in and to the whole or any part of said premises. Third. To pay all taxes and assessments which may be laid on the premises, or any portion or portions of them, after they shall come into the possession of the said lessee by the proper authorities. Fourth. After the expiration of five years from the said twenty-seventh day of November, to surrender to the United States such a portion or portions of the premises as may be required for the actual uses of the government, and which may be called for by the proper authorities; it being understood that in case such claim should extend to portions of the premises upon which large amounts of money shall have been expended in permanent improvements, that the said lessee shall be allowed a fair compensation for such improvements, to be determined by three disinterested men, impartially selected according to usual forms, and for such claims as are made for the purposes specified in the article, the said lessee to have quiet and peaceable possession for the whole ten years aforesaid. Fifth. In case the United States shall claim and appropriate any portion or portions of the premises before the expiration of the term of this lease, then, in such case, the said lessee shall be allowed not less than ninety days to remove the buildings thereupon, or the United States government may, at its option, purchase the same upon the valuation of three men selected as aforesaid, and the same conditions respecting the removal or purchase of the buildings shall hold at the termination of this lease. Sixth. The said Shillaber agrees honestly and faithfully to defend and protect the interests and rights of the United States in and to all and every part of the lands embraced in this indenture, but if it shall be decided by the proper tribunals that any other person or persons possess a valid and bona fide title to any portion or portions of them, and if such person or persons shall have or shall obtain legal possession thereof, then, in such case, the portion or portions so claimed and obtained shall be considered as not embraced in this indenture, or lease, this indenture holding good with all the conditions and exceptions to all other parts and portions of the premises herein described. Seventh. In default of the payment by the said lessee within the year for which it is due of the $2,000 aforesaid, this

lease to become null and void, and the said lessee to surrender the premises to the United States. Eighth. At the expiration of the ten years aforesaid, the said Shillaber agrees to surrender the whole premises peaceably to the United States. It being understood that should the lessee be required to surrender any portion or portions to them before the expiration of ten years, that a fair correspondent diminution of the rental of $2,000 is to be allowed to him. Ninth. The said Shillaber agrees not to allow any person whatsoever to participate in the uses or profits of the premises herein described, who does not fully and without reservation or predisposition of his claim subscribe to all the conditions of this lease. In witness whereof, the said parties to this indenture have hereunto set their hands and seals the day and year first above written.

     Theo. Shillaber (Seal.)
     E. D. Keyes (Seal.)
Captain Third Artillery, Commanding at San Francisco.

Executed in presence of Robert R. Pierpont, Thos. I. Peachy.

It is understood that at the termination of this lease, the said Shillaber is not to claim, nor are those holding under him to claim any compensation for any excavations or embankment made upon such portions of the premises, as he may hold during the whole ten years.  Theo. Shillaber. (Seal.)
     E. D. Keyes.  (Seal.)
Captain Third Artilley, Commanding at San Francisco.

Witnesses: Robert R. Pierpont, Thomas I. Peachy.

Territory of California, District of San Francisco, ss.: Before me, first alcalde of said district, personally appeared the within named E. D. Keyes and Theodore Shillaber, who acknowledged the within instrument to be their voluntary act and deed for the purposes therein mentioned.

Given under my hand this twenty-ninth November, A. D. 1849.

     Jno. W. Geary, First Alcalde.

Approved: B. Riley, Brevet Brigadier-General U. S. A., Commanding the Department.

Having examined the above lease, and being satisfied that it is to the interest of the United States to place the property herein demised in the possession and under the legal control of those whose interest and duty it will be to protect the property from squatters and adverse claimants, I hereby ratify and confirm the same on the part of the United States.  Alex. H. H. Stuart,
     Secretary of Interior.

(No. 8.)

San Francisco, Feb. 26, 1850.

Captain E. D. Keyes, U. S. A., Captain Commanding at San Francisco—Sir: As the lessee of the government reserve on Rincon Point, from you in your official capacity, which lease has been approved by your superior officer, General Riley, I have to request that you will maintain me in possession of the rights which I have to said reserve, in virtue of the title derived from you, and that you will assist me in maintaining inviolate the claim of the United States thereto.

I therefore desire that you will take such measures as may appear to you most proper to eject from said "reserve" all such persons now residing thereon as are there without my consent. My own endeavors to establish possession thereon have been rendered futile by the refusal and threats of the squatters now occupying it. I am, sir, your most obedient servant,   Theo. Shillaber.

(No. 9.)

Presidio of San Francisco, Feb. 28, 1850.

Major E. R. S. Canby, Ass't Adj't Gen'l: Sir: Having been notified by Mr. Shillaber yesterday that he could not get possession of the reserve at Rincon Point, which was leased to him in November last, I immediately repaired to that place, and notified the squatters that they must leave in twenty-four hours. Some promised to go, and others refused. To-day at one o'clock p. m., I marched to Rincon Point with all my disposable force, and was obliged to order the pulling down of two tents and two sheds claimed by a man named White. The structures were removed without unnecessary violence, and no injury was done to his goods. Most of the other squatters promised to remove peaceably, and no other use of force was made. Immediately on my return to San Francisco, I was summoned by the judge of first instance, Judge Almon, to appear in his court. I appeared accordingly, and, after hearing the case, was discharged. White is an Englishman by birth, and I feel convinced he has backers whose design it is to get the reservations annulled, and to set at naught all the proceedings of officers of the army in reference to them. Unless those reservations are maintained, I do not see how officers can maintain themselves at their posts, whenever it shall appear to be the interest of citizens to dispossess them. The case appears to me to be a difficult one under present circumstances, and I trust it may be urged to a settlement at Washington by General Riley. Judge Almon refused to grant an injunction to stay my proceedings, but stil I am not determined whether to go on and force others off or not. I therefore take the liberty to ask for further instructions. Under the circumstances of my position, I deem it proper to request the withdrawal of the tender of my resignation. A letter to that effect will accompany this.

I have the honor to be, sir, your most obedient servant,  E. D. Keyes.
    Capt. Third Art'y Com'g Post.

(No. 10.)

Headquarters 10th Military Department.

Monterey, Cal., March 12, 1850.

Capt. Keyes: Sir—Your letter of date February twenty-eighth last has been received, and laid before the commanding general, who directs me to say that your course in ejecting the intruders on the government lands, was correct: that this matter has been several times reported at Washington for the action of the war department, and that until that action be known you will continue to preserve the public reserve from private occupation; that your letter recalling the tender of your resignation, has been forwarded with his approval.

I am, sir, very respectfully,

J. Hamilton,

Second Lieut. Third Art'y A. A. A. Gen'l.

To Capt. E. D. Keyes, Third Art'y, Presidio of San Francisco.

(No. 11.)

Caution to Purchasers.

The public are notified that neither Crane & Rice, nor any other persons are authorized to sell any houses, buildings or lots on "Rincon Point," or to occupy any point of said land, without permission from Theodore Shillaber, to whom the exclusive possession of the same legally belongs.

Horace Hawes,

Attorney for Theodore Shillaber.

San Francisco, September 28, 1850.

The land above mentioned is included between Folsom street, Beale street, and the Bay of San Francisco.      Horace Hawes.

(No 12.)

San Francisco, June 6, 1851.

Sir: The undersigned having been appointed by the secretary of the treasury, commissioner to superintend the construction of a custom-house and marine hospital, in San Francisco, have, under instructions from that department, selected Rincon Point as a suitable site for a marine hospital, we have examined the indenture by which that point, together with another portion of what is known in this city as the "Government Reserves," was leased to you, on the twenty-ninth of November, 1849, by Captain E. D. Keyes, for the period of ten years, and without expressing any opinion, or meaning to be understood as indicating an opinion with regard to the validity of said lease, we are clearly of opinion that the United States have, by the express terms thereof, the unquestionable right to take possession and use, and occupy, at any time, any portion or portions thereof, for government purposes, the lessee to be allowed the term of ninety days for removing any buildings which may have been placed thereon. We, therefore, beg respectfully to inquire whether this be your understanding of the true intent and meaning of said indenture, and whether, if this be not your understanding, it is your intention to control the right of the government to take possession and use, and occupy said point for the purpose above indicated, the said term of ninety days being allowed for the removing of any buildings which may have been erected on the premises.

Very respectfully, your obedient servant,

Allen A. Hall,

J. Butler King,

Commissioners for Construction of Public Buildings.

Captain Theodore Shillaber.

(No. 13.)

San Francisco, Cal., June 10, 1852.

To Major O. Cross, Quartermaster U. S. Army—Sir: Your letter of the second June, is before me In reply to your questions, I have to state that: First. The reserve made particularly for military purposes, such as warehouses, etc., is that at Clark's Point, between Pacific street and Broadway, and comprises all that portion east of Sansome street, out to Ship's Channel, with the exception of fifty vara lot No. 318, on the south-east corner of Sansome street and Broadway, which was sold by the city authorities, before the reservation was made. Second. The lots east of Montgomery street, and between Washington and Jackson streets, out to Ship's Channel. These were reserved for the custom-house or revenue purposes. Third. The lots on Rincon Point, east of Beale street. These were reserved for military purposes, or for hospital or other government works. Fourth. The authority under which these reservations were made, was that of General Kearny, while in command in this country, in the spring of 1847. General Kearny authorized the sale of the property commonly known as "beach and water lots" or the flats in front of this city, by the authorities of the town, and directed the principal military and naval authorities here to reserve from that sale all such lots and locations as they thought might be required for government purposes. In accordance therewith, the late Commodore Biddle, U. S. Navy, Major J. K. Hardie, 1st regiment N. Y. volunteers and myself, made the reservations heretofore described. Fifth. The property known as "Government Reserves" is now held, I believe, by Messrs. Palmer, Cook & Co., on lease for eight years. The leases were given by Capt. E. D. Keyes, U. S. army, to Theodore Shillaber, and Messrs. Palmer, Cook & Co., hold as Shillaber's assignees. Much of the property is held by title in conflict with those of Messrs. Palmer, Cook & Co., some of them are squatters' claims, and some pretended grants. I think there are no genuine grants to any portion of the original reserves as made by the officers above named, in 1847. It was an object to get reserves far from

claims of every kind. Sixth. I believe the property described above to be worth $750.-000. Seventh. I do not know the term of leases to Messrs. Palmer, Cook & Co., but I am informed that they have never paid anything for the use of the property they hold.

I am, sir, respectfully, your obedient servant. J. L. Folsom, A. Qr. Master.

(No. 14.)

Whereas by ordinance. No. 280 of the common council of the city of San Francisco, it was ordained as follows: "The people of the city of San Francisco do ordain as follows: That his honor, the mayor, be directed to convey on their behalf to the United States, all their right, title, and interest, in and to certain six fifty-vara lots, bounded and described as follows: On the east by Spear street; on the south by Harrison street; on the west by Front street; and on the north by the beach, the whole comprehended within an area of one hundred varas by one hundred and fifty varas." Now, therefore, this deed made and entered into this eleventh day of December, eighteen hundred and fifty-two, by and between the city of San Francisco by Charles J. Brenham, the mayor thereof, party of the first part, and the United States of America, party of the second part, witnesseth, that for and in consideration of the premises, and of the sum of one dollar to the party of the first part in hand paid by the party of the second part, the receipt of which is hereby acknowledged, the said party of the first part doth by these presents grant, convey, and quitclaim unto the said party of the second part, all the right, title, interest, claim and demand, legal or equitable in possession, remainder, or reversion, of the said party of the first part in and to the premises aforesaid, and every part thereof, which premises are situated and being within the corporate limits of said city, and are bounded and described as set forth in said ordinance. To have and to hold the said premises with all the privileges and appurtenances thereunto belonging, unto the said party of the second part forever. In witness whereof, the said Charles J. Brenham, mayor of said city, hath hereunto set his hand and caused the official seal of said city to be hereunto affixed, the day and year aforesaid.

(Seal.) C. J. Brenham, Mayor.

I hereby certify that the copy of ordinance, No. 280, included within the foregoing deed, is a true copy of an original ordinance returned by the mayor to the common council with his approval. December 10, 1852. Edward Toby, Clerk of the Common Council. San Francisco, Dec. 13, 1852.

State of California. County of San Francisco, ss.: On this fourteenth day of December, 1852, personally appeared before me, Frederick A. Sawyer, a notary public for said county. Charles J. Brenham, mayor of the city of San Francisco, and Edward Toby, clerk of the common council of said city, to me known to be the individuals described in and who executed the several instruments above, to which their names are subscribed, and acknowledged to me that they executed the same freely and voluntarily. and for the purposes therein mentioned. In testimony whereof I have hereunto set my hand and seal of office this day and year last above written.

(Seal.) F. A. Sawyer, Notary Public.

Recorded in recorder's office of county of San Francisco, Liber 19 of Deeds, page 101, December 14, 1852, twelve o'clock m.

Thos. B. Russum, County Recorder,
By Jo. Clement, Dep'y.

Delos Lake. U. S. Atty.
S. W. Holliday. for defendant.

FIELD, Circuit Justice. This is an action for the possession of a portion of the fifty-vara lots, numbers five and six, in block lying between Folsom and Harrison streets. and between Main and Spear streets, in the city of San Francisco. The demand in the complaint is for the entire lots, but it was admitted on the trial that the title of the plaintiff does not extend to that portion of the lots which lies below the ordinary high-water mark of the Bay of San Francisco. as that mark existed on the acquisition of the country.

The claim of the plaintiffs to the upland portion rests upon the hypothesis that previous to the admission of California into the Union, the premises were reserved for public purposes by the action of officers of the army of the United States, and that such reservation was recognized by the subsequent legislation of congress. and by the decree of this court in the Pueblo Case [Case No. 12,316].

The defendants not only controvert the positions of the plaintiffs, but assert title in themselves. or parties they represent. from three sources: (1) By virtue of a grant from a justice of the peace of the city of San Francisco, in January, 1850; (2) by virtue of a deed from the sheriff of the county of San Francisco, bearing date in October, 1851, executed upon a sale of the premises under a judgment and execution against the city; (3) by virtue of a conveyance by the city through the commissioners of the sinking fund created in 1850, and the commissioners of the funded debt created in 1851. That a Mexican pueblo existed at the site of the present city of San Francisco upon the acquisition of the country by the United States. on the seventh of July, 1846; that it possessed an interest in lands to the extent of four square leagues measured off from the northern portion of the peninsula upon which the city is situated; and that

the city has succeeded to such interest, are matters no longer open to discussion. They have been settled by judicial decision in a controversy between the city and the United States after the most mature consideration.

It was admitted on the trial that the premises in controversy were within the four square leagues mentioned. They were not, therefore, the subject of levy and sale under judgment and execution against the city. That source of title to the defendants may therefore be laid aside. So the grant of the justice of the peace may also be passed over without consideration, as no authority for the exercise of any power to grant portions of the municipal lands by officers of that description in the pueblo has been furnished us in the laws or customs of the country. The alleged title of the defendants by conveyance from the city arises in this wise: In August, 1850, the common council of San Francisco passed an ordinance to create a fund for the erection and promotion of city improvements, and provided, in the execution of this purpose, for the issue of city stock to be called a "sinking fund stock." The ordinance appointed a board of five persons, entitled "the commissioners of the sinking fund," and invested them with the charge of all the real estate in the possession of the city, and pledged the property as security for the redemption of the stock and interest at maturity. By a subsequent ordinance the common council directed a conveyance of this property to be made to the commissioners, in trust, for the purposes mentioned; and such conveyance was executed on the twenty-fifth of December, 1850. This conveyance includes the premises in controversy, and all the tract known as the "Government Reserve" at Rincon Point.

On the fourth of May, 1851, the legislature of the state passed an act "to authorize the funding of the floating debt of the city of San Francisco, and to provide for the payment of the same." The act created a board called "Commissioners of the Funded Debt of the City of San Francisco," and directed the commissioners of the sinking fund, created as mentioned by the ordinance of the city, to convey to them all the property and rights of property belonging to the city; and empowered them to sell or lease the property at such time and place as in their discretion the interest of the city might require, and to apply the proceeds to the liquidation of its floating debt.

Under this act the commissioners of the sinking fund, on the seventeenth of May, 1851, executed the conveyance directed, of all the property embraced in the deed which they had received. Soon after the issue of the grant by the justice of the peace, which we have mentioned, the defendants, or the parties whom they represent, went into possession of the premises, and were in possession when they obtained the conveyance of

the sheriff. Under the title thus derived they asserted ownership until the passage of the ordinance of the common council for the settlement of land titles, in June, 1855, known as the "Van Ness Ordinance," and its confirmation by the legislature in March, 1858, after which they also claimed under the ordinance. Some conflict thus arose between them and the commissioners of the funded debt. Similar conflicts had also arisen with other parties, claiming under like circumstances against the commissioners. To remove the embarrassment arising from this cause, the legislature, in April, 1862, passed an act authorizing a compromise between parties thus situated and the commissioners; and a conveyance of the title by the latter to such parties. Under this act, and in pursuance of its provisions, a compromise was effected, and conveyances were executed in 1862, and 1863 to the defendants, or the parties represented by them.

No question is raised as to the validity of these conveyances, except that the premises had previously been appropriated for the public purposes of the government. Though it has been held that there was no authority in the common council of the city, under the charter of 1850, to create the board of commissioners of the sinking fund, or to execute a conveyance of the city property to them, yet it has not been doubted that it was competent for the legislature to direct a conveyance of the property by them to the commissioners of the funded debt, or that such conveyance passed the interest of the city. The power of the city to dispose of the property was, after the admission of California into the Union, subject to the control of the legislature of the state. The legislature could restrain or enlarge, at its pleasure, the authority of the agents of the city over the property, and could authorize a transfer of the title through the commissioners of the sinking fund as well as in any other way, or through any other body. Payne v. Treadwell, 16 Cal. 233, and authorities there cited.

The real question, therefore, at issue, relates to the efficacy of the acts of the officers of the army of the United States, in creating a reservation of the premises before the title had thus passed from the city, and the effect upon such acts of the legislation of congress and the decree in the Pueblo Case. In considering the claim of the plaintiffs, we shall assume, that until the action of the city authorities in disposing of the property, the United States retained the same right to reserve for public purposes portions of the pueblo lands to which the city had succeeded as they possessed to reserve portions of the public domain; at least, that they retained such right previous to the admission of California into the Union. As we have had frequent occasion to observe, it is difficult to state with precision the exact nature of the title or interest which the pueblo possessed in its lands. They were not held in

absolute property, with full right of alienation and disposition. They were subject to the control and disposition of the government, until by proceedings of the officers of the pueblo, acting under the regulations established for the disposition of the property, the title passed to private parties. Several grants to individuals within the limits of the four square leagues were made by the governors of the department, some with, and some without, the sanction of, or consultation with, the authorities of the pueblo. The validity of these grants has been repeatedly recognized by judicial decision. If the governors could thus pass the title to private persons, it would seem to be a reasonable inference, as we said in the case of Grisar v. McDowell [Case No. 5,832], "that they could reserve from the disposition of these authorities such portions of the lands as might be required by the government for public purposes." This right of control and disposition, which existed with the former government, passed upon the cession of the country, with all other public rights, to the United States, and could afterward be exercised by them at any time before the property had passed to third parties by the action of the authorities of the pueblo in accordance with existing law.

The various acts of the officers of the army of the United States, upon which the asserted reservation is based, can be briefly stated. On the tenth of March, 1847, whilst California was in possession of the military forces of the United States, Brigadier-General S. W. Kearny, then acting as military governor of the country, issued a document purporting to grant and convey to the town of San Francisco all the right, title and interest of the United States, and of the territory of California, in the beach and water lots on the east front of the town, included between points known as "Rincon" and "Fort Montgomery," excepting such lots as might be afterwards selected for the use of the government by the senior officers of the United States, then present at the town. The attempted grant was subject to the condition that the property should be sold at public auction after three months previous notice. On the twenty-third of June, 1847, Major General Sherman, then first lieutenant of the third artillery, and assistant adjutant-general, acting under the authority of Colonel Mason, who had succeeded General Kearny, as military governor of California, directed Major Jas. A. Hardie, who was then in command at San Francisco, to consult with Commodore Biddle, or other senior naval officers on the station, and to select, in accordance with the terms of the grant of General Kearny, lots best suited for wharves, both for army and navy purposes, with space for all the buildings that it might become necessary to erect, and a suitable lot for a customhouse, and the storehouses that it might require; and to inform the alcalde of the town of the selections made before the day of sale under the grant. On the eighteenth of July, 1847, Major Hardie informed the alcalde of the town that, in obedience to the orders of the governors he had selected for the use of the government all that portion of Rincon Point which was not then divided off into lots, and was marked "Government Reserve" upon a map of the beach and water lots then in the alcalde's office; and that the portion thus designated included all of Rincon Point, lying east of Beale street and south of Folsom street, and bounded by the tide waters of the bay; and that he had also selected certain described beach and water lots. On the thirtieth of September, 1847, Colonel Mason, acting as such military governor, notified the alcalde of the town not to grant or give any deed for lots within the tract thus designated at Rincon Point, stating that the land was intended for the use of the United States government. Several communications between the commanding generals of the country and subordinate officers, subsequent to 1847, up to the time of the admission of California into the Union, relate to the land designated at Rincon Point, and speak of it as reserved to the government for public purposes. Notices were directed by the officers to be published forbidding the erection of buildings upon the premises, or any intrusion thereon, and in some instances parties intruding were forcibly removed. On the twenty-seventh of November, 1849, General E. D. Keyes, then captain of the third artillery at San Francisco, executed, with the approval of Brigadier-General Riley, the successor of Colonel Mason, as military governor of California, to Theodore Shillaber a lease for ten years of a part of the beach and water lots known as the "Government Reserves," and also that portion of the upland thus designated as Rincon Point. This lease was approved by the secretary of the interior in April, 1851. In June, 1851, the commissioners for the construction of public buildings at San Francisco, appointed by the secretary of the treasury, notified the lessee, Shillaber, that acting under the instructions of the secretary, they had selected Rincon Point as a suitable site for a marine hospital, without, however, indicating what portion of the general tract thus designated was intended. By a provision of the lease to Shillaber, the government reserved the right to take possession at any time of any portion of the property which might be required for its purposes, the lessee being allowed ninety days for the removal of any buildings, which might be placed thereon.

Previous to the selection, and on the thirtieth of September, 1850, congress had appropriated the sum of $50,000 for the construction of a marine hospital, to be located by the secretary of the treasury, at or near San Francisco. In August, 1852, and in August, 1854, further appropriations were made for the completion of the building, and

the arrangement and inclosure of the grounds upon which it is situated. But before the erection of the building was commenced. application was made on behalf of the government to the city of San Francisco for a conveyance of its interest in the land at Rincon Point. which had been selected as the site of the hospital. In accordance with that request an ordinance was passed on the tenth of December. 1852. by the common council of the city. directing the mayor to execute to the United States a conveyance of its right, title and interest to six fifty-vara lots. which include the premises in controversy. The hospital was subsequently erected on two of these six lots. being lots numbers one and two of the block, and out-buildings connected with the hospital were erected on two others of them. being numbers three and four of the block.

It is very clear from this statement of the action of the military officers of the United States. that there was no valid reservation for public purposes made by them of the tract at Rincon Point. The treaty of Guadalupe Hidalgo was not made until the second of February. 1848. and ratifications were not exchanged until the thirtieth of May following. Until the treaty. and long subsequently. California was simply occupied by the military forces of the United States, and whatever powers the officers of the army may have exercised, from the necessity of the case, for the preservation of the country and maintenance of public order. the power to grant or dispose, or to reserve from grant or disposition. any portion of the pueblo lands. or any portion of the public property of the United States. was not one of them. They could in no respect impair any rights which the United States may have acquired over either by the conquest. or might subsequently acquire by treaty. If the absolute title to the land had passed to the United States. neither its alienation, nor its reservation could have been made. except by congress. or subject to its regulation. The constitution vests in that body the sole power to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States. The attempted grant to San Francisco of the beach and water lots by General Kearny was. therefore. without any validity. It was an act beyond his authority to execute. and it. of course. passed no interest whatever.

The selection made by Major Hardie of the upland at Rincon Point. for the use of the government. was not a selection in accordance with the terms of the Kearny grant, as that grant embraced only beach and water lots; nor was the selection in conformity with the instructions of Colonel Mason. under which Major Hardie purported to act. This fact. however. did not change the character of the proceeding. for such selection appears to have been subsequently approved by the commanding general. This approval. however. did not add to or give validity to the transaction. If the title had been in the United States absolutely. the selection and the subsequent acts of the military officers in excluding intruders, and in holding the premises. would not have effected an appropriation of the land to public purposes. Such appropriation of public lands could only have been made by act of congress or order of the president. and it is not pretended that any such act was passed or any such order was made in the present case.

Nor can the legislation of congress. in September. 1850. appropriating $50,000 for the construction of a marine hospital, to be located by the secretary of the treasury. at or near San Francisco, be justly considered as giving any sanction to the previous proceedings of the officers of the army. or as having any reference whatever to the property at Rincon Point. It only indicated the intention of congress that the institution should be erected at or in the vicinity of the city; and was as applicable to any other point as the one finally selected by the commissioners of public buildings. The appropriations made in 1852 and 1854 for the completion of the building and the inclosure of the site. cannot be deemed to have any efficacy whatever. as the title had previously passed to the commissioners of the funded debt under the legislation of 1851.

There are several circumstances which go to show that the title derived from the city is the only title upon which the United States ever relied. In the first place, the tract designated as "Rincon Point" by the officers of the army in the proceedings to make a reservation. included all the land lying east of Beale street and south of Folsom street, and bounded by the tide waters of the bay. which embraces several entire blocks; but the United States since 1850 have made no claim, except in one instance, to any portion of it. besides the six lots embraced in the deed of the city. The exceptional instance was in 1865. when suit was brought for the entire tract. The suit was abandoned. it is understood. upon a representation of the facts at Washington. In the second place, in November. 1850. a formal reservation was made by order of President Fillmore. for the purposes of the government. of several parcels of land at San Francisco. and its vicinity. and no reference was made therein to the land at Rincon Point; nor was any such reference made in any subsequent order of the president respecting reservations at San Francisco. The approval of the lease to Shillaber. by the secretary of the interior. in April 1851. added nothing to the validity of the attempted reservation. Whilst the president was authorized. in particular cases. to reserve from sale for public uses portions of the public lands. no such power was vested in the head of any department of the government. Nor could the secretary of the treasury execute or approve of

a lease of any property belonging to the United States without special authority of law. In the third place no attempt was made to erect the building until after the deed of the city was obtained.

It only remains to consider the effect of the final decree in the Pueblo Case. Parties obtaining conveyances from the city, whilst its claim for the lands was pending before the tribunals of the United States, necessarily took whatever they acquired, subject to the determination of the claim. Their title stood or fell with the claim, for the decree took effect by relation on the day when the petition of the city was presented to the land commission, in July, 1852. It is to be considered as if entered on that day. The claim confirmed embraces an area of four square leagues, subject to certain deductions, among which are "such parcels of land as have been heretofore reserved or dedicated to public uses by the United States." It is contended that this exception covers the premises in controversy. We do not think so. The terms are fully answered by limiting the application to the four lots actually occupied by the hospital, and the reservations at the Presidio and Black Point. They cannot be extended so as to embrace the two lots claimed by the defendants without being also extended so as to include the whole of the tract known as "Rincon Point," embracing several blocks held under conveyances from the city, and which have been improved by the erection of large and valuable buildings. The construction contended for would also conflict with the concluding clause of the decree, which declares that the confirmation is in trust for the benefit of lot-holders under grants from the pueblo, town or city of San Francisco. The term "grants" comprehends all previous conveyances from the city.

It follows that judgment must pass for the defendants. Counsel will prepare the proper findings, and present them to the court for settlement.

Findings were accordingly filed and judgment entered thereon for the defendants. The case was afterward taken to the supreme court of the United States, on writ of error, and the judgment was there affirmed by a divided court.