EDNA EARL DUNLOP, Respondent, v. F. J. O'DONNELL et al., Appellants.

BRUNSWIG DRUG COMPANY (a Corporation), Respondent, v. F. J. O'DONNELL et al., Appellants.

Walter R. Leeds and Frank P. Jenal for Appellants.

Mott, Vallee & Grant for Respondents.

O'Melveny, Tuller & Myers, as *Amici Curiae* on Behalf of Respondents.

BARNARD, P. J.—The material facts and issues in these two actions, which have been consolidated for the purposes of this appeal, are identical and everything said herein will apply to each case.

The respondent is the owner of a certain parcel of land abutting on the northerly side of Third Street between Spring and Broadway Streets in the city of Los Angeles. The appellant O'Donnell, as the agent of the appellant Stimson, commenced the construction of a tunnel containing a permanent cement conduit some five and one-half feet wide under the northerly half of said Third Street, in front of the respondent's property. This tunnel was being constructed for the purpose of installing therein pipes and other equipment for taking steam and hydraulic power from one building to another under a private contract entered into by the appellant Stimson and other private parties. While a permit to construct the tunnel had been secured from the municipal authorities, under an ordinance regulating the making of excavations in public streets, it is conceded that the same would be operated as a private business venture and not as a public utility. After written notice protesting against the construction of this tunnel and claiming ownership in fee of this portion of the north half of said Third Street, the respondent brought this action to enjoin the appellants from constructing or maintaining such a tunnel through this property. The facts were stipulated at the trial, findings and judgments were entered in favor of the respondent, and this appeal followed.

Among other things, it was stipulated that the respondent is the owner of a portion of lot 6, block 4, of Ord's Survey, city of Los Angeles, county of Los Angeles; that the usable portion of this property abuts on Third Street and is improved with a business block; that the respondent deraigns title from one John Temple; that the property was conveyed to the said Temple by the city of Los Angeles by a deed dated May 3, 1855; that the property in question is a part

of the pueblo lands originally granted to the pueblo of Los Angeles by the King of Spain, both for the public purposes of the pueblo and for the purposes of subdivision and disposition by the pueblo authorities to settlers within the pueblo; that by treaty all of California, including the pueblo of Los Angeles, became a territorial possession of Mexico in 1819; that in 1848 all of California was ceded to the United States by the treaty of Guadalupe Hidalgo; that from 1848 to the admission of California as a state and the adoption of a Constitution in 1850 California was under the military rule of the United States; that the city of Los Angeles was incorporated April 4, 1850; that in 1849, the pueblo of Los Angeles employed one Ord to make a survey and to plat certain of the pueblo lands; that a map of said survey and plat was filed with the pueblo of Los Angeles on August 29, 1849, but was not recorded until about the year 1875; that this plat was and is generally known as Ord's Survey; that on or about November 7, 1849, a public auction of certain of its pueblo lands was held by the pueblo of Los Angeles; that lot 6, block 4, of Ord's Survey was sold to John Temple and a receipt showing said purchase was issued; that under the act of Congress of May 3, 1851, the city of Los Angeles started its application to the board of land commissioners to secure title to the old pueblo lands on October 19, 1852; that on August 9, 1866, a patent was issued by the United States which gave to the city of Los Angeles title to the old pueblo lands; that on May 3, 1855, the city of Los Angeles, by deed, conveyed the property here in question to John Temple; that Third Street, as shown on the map of Ord's Survey, has at all times since the filing of said map been a public street in the city of Los Angeles; and that appellant Stimson does not intend to operate the tunnel in question as a public utility, the purpose of said tunnel being to permit him to afford certain services to such parties as he may elect to deal with for his personal profit and benefit under private contract. It was further stipulated that the appellants have not secured the consent of the respondent for the construction of the proposed tunnel and that the appellants have no right, title or interest in that portion of Third Street other than an interest as property owners in the city of Los Angeles and such rights as they may have acquired under the permit for the construction

of the tunnel which was issued by the board of public works of said city.

It is conceded that the sole issue presented to the trial court for determination under the pleadings and stipulation of facts was the legal correctness of the claim that the respondent is the owner in fee of the adjoining portion of the north half of Third Street, subject only to an easement for the use of the same for street purposes. In other words, the controversy is as to whether the conveyance of this property by the city to John Temple by deed describing the same as a certain lot according to the map of Ord's Survey carried with it the fee to the thread or center line of Third Street, upon which the property faced, or whether the said conveyance carried title only to the north edge of that street as delineated on that map.

The first point raised by appellants is that this deed conveyed title only up to the side line of the street and not to the thread or center line thereof, for the reason that the property now owned by the respondent was originally municipally owned land of the city of Los Angeles. While it is conceded that a similar conveyance by a private party would carry the fee title to the center of the street, in the absence of anything showing a contrary intention, it is urged that under a general rule of law, a conveyance of municipally owned land by a municipality conveys title only to the side line of the abutting street and not to the thread or center line thereof. In support of this proposition the appellants cite certain cases from other jurisdictions but none from this state.

After reading all of the cases cited by both parties we are unable to agree that a general rule exists to the effect contended for by the appellants. It is true that some conflict appears in the decisions. In some cases the rule contended for by the appellants has been more or less establishd because of local statutes. (See *Ryerson* v. *City of Chicago,* 247 Ill. 185 [93 N. E. 162] ; *Burbach* v. *Schweinler,* 56 Wis. 386 [14 N. W. 449].) Except where such statutory limitation exists we think the weight of authority and the better reasoning of the cases support a contrary rule. In addition to the cases cited see *Paige* v. *Schenectady Ry. Co.,* 178 N. Y. 102 [70 N. E. 213] ; *Geddes Coarse Salt Co.* v. *Niagara etc. Co.,* 207 N. Y. 500 [101 N. E. 456] ; *Willock* v.

*Beaver Valley R. R. Co.*, 222 Pa. 590 [72 Atl. 237]; *Cosgrove* v. *Kingston Coal Co.*, 186 Pa. 43 [40 Atl. 151]; *City of Dubuque* v. *Maloney*, 9 Iowa, 450 [74 Am. Dec. 358]; *City of Boston* v. *Richardson*, 95 Mass. (13 Allen) 146. In the last case cited the court said: "It was also argued that a different rule should be applied to boundaries of this kind in public grants, because they are to be taken most strongly against the grantee. (*Commonwealth* v. *City of Roxbury,* 9 Gray (Mass.), 492.) But that rule, like its converse in favor of the grantee in private grants, is only to be resorted to when the language is so ambiguous that all other rules of construction fail." In *Willock* v. *Beaver Valley R. R. Co., supra,* it is said: "There is no sufficient reason why the same rule should not apply to the commonwealth under the facts of the case at bar. The reasonable construction to be placed upon the acts of assembly authorizing the laying out of the town and the sale of lots in this case and of the acts of the officers intrusted with the execution of these powers, is that the legislature intended the purchasers of lots to enjoy every privilege and be invested with every legal right passing to any purchaser of a lot abutting on a public street, and this would pass the title of the fee to the center of the street to the purchaser as in the case of a purchase from an individual grantor." In *Cosgrove* v. *Kingston Coal Co., supra,* the court calls attention to some of the unnecessary evils and confusion which might well arise if the fee in a street should be separated from that of the abutting property.

In *Weyl* v. *Sonoma Valley R. R. Co.*, 69 Cal. 202 [10 Pac. 510], in considering a contention similar to that made here, the court, after considering our code sections and other authorities with reference to the rule governing a conveyance by a private person, says: "We cannot agree to the rightfulness of defendant's contention that a different rule should prevail with respect to the ownership of a street up to its center, or thread, on which one's lots abut, where sales of Sonoma pueblo lands have been made by the commissioners authorized so to do, from sales of lands made by other persons." The different rule contended for in that case and here, with respect to the effect of a deed from a municipality, has never been adopted in this state. On the other

hand, the language of the decision just referred to plainly indicates an approval of the other rule, and that decision has not been challenged these many years. It may well be that property rights have in the meantime been acquired in reliance thereon and whether or not that case be taken as definitely establishing the rule, its weight may be added to the authorities and the reasoning in support of what, in our opinion, is the better rule.

The appellants seek to distinguish that case on the ground that the city of Sonoma had been disincorporated, that commissioners had been appointed by the legislature to dispose of its remaining lands, that the trust under which the pueblo had held title to its streets was terminated, and that the commissioners, in deeding the property, were acting in a proprietary and not in a municipal capacity. It has long been the custom for many of our cities to dispose of lands held by them for the purpose, among other things, of encouraging settlement and the general development of the community and, in so doing, these cities may be said to have acted in a proprietary rather than a municipal capacity. This is peculiarly true of cities holding pueblo lands and we see no distinction, in this respect, between the sale of such lands by the city of Los Angeles and the similar sale by commissioners appointed for that purpose which was under consideration in the case referred to.

Our code sections, in establishing a rule in this regard as between private persons, make no exception with respect to a conveyance from a municipality. (Civ. Code, secs. 831 and 1112.) Not only do we see no good reason for establishing a different rule in such a case, but this would seem to be especially true with respect to former pueblo lands, since portions of such lands were originally allotted to the pueblos for the very purpose of subdivision and sale to private persons and since these former pueblos, on becoming California cities and after perfecting their titles in accordance with an act of Congress, became holders of large tracts of such land so designed for subdivision and settlement and which were later conveyed into private ownership. In making such sales and conveyances to private owners and settlers these cities were acting in a proprietary rather than a municipal capacity and many large areas in many cities have been so con-

veyed. The fact that pueblo lands have been thus subdivided and sold in a manner so similar to that in which private subdivision has been carried on, and the fact that the cities in so doing have acted more in a proprietary than a municipal capacity, make it especially appropriate to apply to such cases the rule that is applied to conveyances made by a private subdivider.

We therefore hold that, in so far as the appellants' first contention is concerned, the deed from the city of Los Angeles to John Temple carried the fee to the thread or center line of the adjoining portion of Third Street.

The second point raised is that the deed from the city to John Temple did not have the effect of conveying a fee title to the thread or center line of the street for the reason that the city of Los Angeles never had any ownership or title, in so far as the street is concerned, which could be conveyed, since the property now owned by the respondent and the abutting portion of Third Street were once owned by the pueblo of Los Angeles. It is appellants' contention that while this territory was under Spanish and Mexican rule a pueblo held certain of its lands in trust for the general community; that in lands so set apart for the common use the pueblo had no title which could be conveyed; that land used for street purposes must be held to have been set apart for common use; that the city of Los Angeles succeeded to the title and rights of the former pueblo of that name; and that the city acquired only the limited title possessed by the pueblo, under section 3 of the act of the state legislature incorporating the city which reads as follows: "The Corporation created by this Act, shall succeed to all the rights, claims, and powers of the Pueblo de Los Angeles in regard to property, and shall be subject to all the liabilities incurred, and obligations created, by the Ayuntamiento of said Pueblo.'' (Stats. 1850, p. 155.)

This argument assumes that the former pueblos could not sell and transfer all of the tracts of land held by them for the purpose of disposal to individuals, but must retain a part thereof for public purposes, and also assumes that title to the pueblo lands passed to the state of California and that the city acquired its title thereto by legislative grant from the state.

The history of pueblo lands, the manner in which they were held and the nature of the title thereto have been exhaustively treated in many decisions in this state, especially in earlier cases, and need not be here considered at length. In a general way, it may be stated that such lands were granted to the pueblo for the benefit of its inhabitants but to be used and treated in various ways. Some of the lands were set apart for the common use of all, the income from another part was to be used to defray the expenses of municipal administration, while other portions were to be conveyed to individuals to be held in private ownership. While the lands set apart for common use could not be sold or disposed of, the pueblo authorities were usually given the right to convey to individuals such portions of the land as were intended for that purpose. ▮ The power of alienation exercised by the pueblo authorities over the latter class of lands was subject to the control of the sovereign power or its agents and could, therefore, be enlarged, decreased or taken away by that superior authority. Whatever title the pueblos had was held in trust with the right in the sovereign to regulate and control the manner in which the trust should be administered and executed. (*Welch* v. *Sullivan,* 8 Cal. 165; *Hart* v. *Burnett,* 15 Cal. 530; *San Francisco* v. *Canavan,* 42 Cal. 541; *City of Monterey* v. *Jacks,* 139 Cal. 542 [73 Pac. 436].)

Under the Mexican law, the lands to be conveyed to settlers by a pueblo were to become and did become entirely separate and distinct tracts from those tracts which were reserved and kept for a common use. (*Welch* v. *Sullivan, supra.*) It may be assumed that the lands kept for common use and which could not be alienated included the part thereof which was used for streets, but we can find no authority for the proposition that any such limitation on the power of alienation was expressly applied to any portion of those other tracts which were set apart for sale and settlement.

Under the treaty of Guadalupe Hidalgo the title to all lands in California not held in private ownership passed to the government of the United States. Under that treaty, as well as by the law of nations, the United States was bound to protect the private rights which individuals had

acquired. Under an act of Congress passed on March 3, 1851 (9 Stats. 631 [U. S.]), suitable provision for this was made. By a tribunal thus established, with the assistance of the courts, such claims of title were to be adjudicated and when allowed were to be confirmed by a patent. In *F. A. Hihn Co.* v. *City of Santa Cruz,* 170 Cal. 436 [150 Pac. 62], it was held that a city succeeding to a pueblo could not found a claim of title to pueblo lands upon any grant from the state of California. It was further held that, with respect at least to lands which it had held in its proprietary capacity and which it was authorized to dispose of into private ownership, a pueblo was in the same position as any holder of a private claim and was required to present its claim of title to such lands for confirmation under this act of Congress, and that under the terms of that act a failure to present such claim within the time prescribed in that act had the effect of making the land a part of the public domain. The city of Los Angeles complied with the provisions of this act of Congress, making application on October 19, 1852, and a patent confirming title in the city being issued on August 9, 1866. In *Dean* v. *City of San Diego,* 275 Fed. 228, it was held that a city of California has no title to any lands as successor to a Mexican pueblo except as its claim was presented to and confirmed by the board of land commissioners under the act of Congress referred to.

A patent to such former pueblo lands issued by the United States Government is conclusive evidence of the title of a city in such lands. (*United Land Assn.* v. *Pacific Imp. Co.,* 139 Cal. 370 [69 Pac. 1064, 72 Pac. 988]; *People* v. *San Francisco,* 75 Cal. 388 [17 Pac. 522]; *Moore* v. *Wilkinson,* 13 Cal. 478; *Knight* v. *United Land Assn.,* 142 U. S. 161 [12 Sup. Ct. 258, 35 L. Ed. 974].) One who obtained a conveyance from a city while the city's claim for pueblo lands was pending before the United States tribunals took whatever interest he acquired subject to the determination of that claim, and the final determination of that claim took effect by relation on the day when the petition was presented to the land commission and is to be considered as effective from that date. (*United States* v. *Hare,* 4 Sawy. 653, Fed. Cas. No. 15303.)

■ Under these authorities the fee to the land here in question vested in the United States until it passed to the city of Los Angeles under the patent issued and by relation as of October 19, 1852, when the application was filed. Similarly the deed from the city to John Temple carried the title which the city had acquired and, aside from any other considerations, that title can now be attacked only by one who relies on a sufficient title issued by competent authority prior to July 7, 1846, when title passed to the United States. (*Welch* v. *Sullivan, supra.*)

In *San Francisco* v. *Canavan, supra,* it was held that when California became a state it succeeded to the power which Mexico had formerly exercised over its municipalities, in respect to the control and disposal of its lands, as soon as the title of the pueblo, or its successors, and the nature of the trust in which the land was held should be recognized by the proper tribunals of the United States. In *Richert* v. *City of San Diego,* 109 Cal. App. 548 [293 Pac. 673, 677], this court said: "In due course, the power formerly lodged in the Mexican government regarding the management, control or disposition of these pueblo lands became vested in the state of California, to be exercised by its legislature, and has there since remained, except in such instances as that body has in turn delegated it to the municipal authorities."

■ While the city of Los Angeles acquired title to the lands here in question and while it held the same under certain trusts for the benefit of its inhabitants it became a municipality under the laws of California and this state succeeded to the powers formerly exercised by Mexico, with respect to regulating the way in which the municipality might act, including the power to direct the manner in which the city might dispose of such lands. In section 3 of the original charter, as above set forth, the state gave to the city the rights, claims and powers of the former pueblo in regard to property but subject to the liabilities and obligations incurred and created by the governing body of the former pueblo. This included the right to sell these lands until and unless that right was taken away by the state, which was not done before this particular land was disposed of. The charter had expressly made such power of disposal subject to any obligations previously assumed by the govern-

ing body of the pueblo. Such an obligation had been assumed and created in 1849 when the governing body of the pueblo sold this property to John Temple, giving him a receipt for the purchase price. At that time title to the property rested in the United States and the city was without power to convey the same except by consent of the United States. (*United States* v. *Hare, supra.*) In effect, therefore, the charter directed the new city to complete and fulfil that obligation, which was done by the delivery of a deed after the act of Congress had been complied with. The patent subsequently issued inured to the benefit of the grantee in this deed, both under the civil law (*Welch* v. *Sullivan, supra*) and under our law. (Cases above cited.) We think this deed, thus authorized and in effect directed to be delivered by the legislature, is to be measured by the situation existing at the time it was delivered and after the city had acquired title from the United States, and is to be governed by and be construed in accordance with the laws of this state and not by the laws of Mexico which had prevailed in that territory some years before. The first session of the legislature in 1850 provided that the common law should prevail in this state rather than the civil law. In conveying this land to John Temple the city acted not as the successor of the former pueblo, but by virtue of the power given it by this state. At the time it acted, under this authority, the common law prevailed here, and we think that act of the city is to be measured by and governed by the law of this state, which had authorized and empowered the city to act in the matter. While the former pueblo had agreed to sell this land to John Temple in 1849, title was then in the United States and the pueblo was powerless to carry out that agreement without the consent of Congress. The delivery of a deed under the implied direction of the legislature, after confirmation of title, operated to fulfil this obligation, but such act was the act of an American municipality and not of a Mexican pueblo. The city and all its acts were then subject to the laws of this state, under which it was created and under which its only powers were held. We see no escape from the proposition that the act of the city in giving the deed, like all other lawful acts of the city, was governed by California law.

It is urged that the civil law applied to a contract made during that period while this territory was under the military control of the United States but in this action we are neither interpreting nor enforcing the original contract whereby this land was sold to John Temple. Regardless of any such contract or the law which might govern it at the time it was made, the contract was either carried out or breached when the deed was delivered. The only question here is as to the effect of the deed which was delivered. Such a question and the extent of the title conveyed by this deed is to be determined by the law of the state in which, and under the authority of which, it was given.

Another consideration is that these pueblo lands were not dedicated to the public in the sense in which we use that term. In *Vernon I. Co.* v. *Los Angeles,* 106 Cal. 237, at page 247 [39 Pac. (2d) 762], the court says: " 'I do not understand that these properties were commons in the common-law sense. They were communal property, subject to be administered by the pueblo authorities. The public could be dispossessed, and the character of the lands changed. They might be sold or converted into solares or suertes, which could be reduced to private ownership. They were not dedicated to the public.' " While certain rights were formerly given to the pueblo authorities with reference to the land here in question, these rights were not fixed, might be changed and were subject to the control of the sovereign power even to the extent of permitting or refusing to permit the land to be sold into private ownership. This right of control over disposition passed to the state. When the same rights formerly exercised by the pueblo were given by the state to the city, the right to sell the land remained subject to the control of the superior authority, which was now the state. There had been no dedication to public use which could not be changed by this superior authority and it must follow that any sales made were subject to any expression of the sovereign will, in other words, to the laws of the state. In our opinion, there is nothing in the record to indicate that the land here in question had been so dedicated to public use under the Mexican law as to prevent the city from obtaining title in fee from the United States or from passing, under authority given to it by the state, such title as may be passed by a municipality under the laws of this state.

14

We conclude that the city of Los Angeles had title in fee to this portion of Third Street and that the deed from the municipality conveyed title thereto, subject to the use of the same for street purposes, to John Temple and to the respondent as his successor. No other attack having been made upon it the judgment must be sustained.

The judgment in each case is affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 30, 1935, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 3, 1935.